Napolean **BATTS, Nettie B. Stowers and Lenore S. Ballard, Plaintiffs–Appellees and Cross–Appellants,**

v.

**NLT CORPORATION, WSM, Inc., and Opryland Productions, Inc., Defendants–Appellants and Cross–Appellees.**

Nos. 85–5063, 85–5084.

United States Court of Appeals,
Sixth Circuit.

Argued July 24, 1986.

Decided April 12, 1988.

William N. Ozier (argued), Bass, Berry & Sims, Nashville, Tenn., for defendants-appellants and cross-appellees.

Richard H. Dinkins (argued), Williams and Dinkins, Nashville, Tenn., Juanita Logan Christian, Ann Arbor, Mich., for plaintiffs-appellees and cross-appellants.

Before MILBURN and BOGGS, Circuit Judges, and DeMASCIO, District Judge.[*]

BOGGS, Circuit Judge.

This case represents the culmination of lawsuits brought against WSM Television of Nashville, Tennessee, and its corporate affiliates, for alleged racial discrimination in a variety of employment practices, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. After an extensive bench trial, the district court made findings of fact and conclusions of law and awarded damages to three individual plaintiffs.

We are mindful of the strong policy considerations that impel the serious attention and careful consideration given by the district court to such allegations. Nevertheless, having carefully examined the record before us, we find the major factual findings of the district court clearly erroneous. The remaining findings are insufficient to support the judgment of the district court, and we reverse.

## I

This action began with the filing of a complaint on May 12, 1978, by the original plaintiffs: Napolean Batts, Veronica Miller, Neal McAlpin, Jr., and Nettie B. Stowers. The complaint alleged that the defendants, NLT Corporation and its subsidiaries, WSM Radio and Television and Opryland Productions, Inc., all of Nashville, had practiced employment discrimination against the plaintiffs on the basis of their race, in violation of the statutes cited above. Later, two other individuals, Lenore S. Ballard and Fletcher Moon, were permitted to intervene as plaintiffs.

The plaintiffs wished to have this case certified as a class action on behalf of black employees and employee applicants of the defendants, past, present, and future. The district judge originally assigned to the case, the Honorable L. Clure Morton (then

---

* The Honorable Robert M. DeMascio, United States District Judge for the Eastern District of Michigan, sitting by designation.

Chief Judge for the Middle District of Tennessee), held a hearing on the issue of class certification on December 4 and 5, 1978. In a Memorandum Decision and Order of January 12, 1979, Judge Morton denied class certification "for the present," but left open to the plaintiffs the opportunity of a further application for class certification after discovery and development of the evidence. In the same order, the district court ruled that the plaintiffs had failed to present a *prima facie* case on the then current state of the pleadings, and that the action should proceed toward trial.

After reassignment to the Honorable John T. Nixon, the case came on for a bench trial, with evidence being presented on twelve different days over a period of about a year, ending on October 7, 1981. It was not until March 23, 1984, that the district court delivered its ruling, in a 93–page Memorandum and Order. The claims of plaintiffs McAlpin, Miller, and Moon were dismissed and they did not appeal. The district court dismissed some of the claims of the remaining plaintiffs, Batts, Stowers, and Ballard, but sustained others. In particular, the court sustained claims of intentional discrimination in the employment opportunities of all three of the successful employees. Batts's claim of discrimination in retaliation for filing discrimination charges in 1978 also was upheld. Ballard's claim of discrimination in her discharge was upheld. Stowers's claims of discrimination in compensation and discrimination in retaliation for filing this lawsuit were upheld, but her claim of retaliation in her discharge was denied. The motion for class certification was denied.

A further hearing on the relief to be afforded the three remaining plaintiffs on the partial ruling in their favor was held on June 15 and 27, 1984. On January 5, 1985, the district court entered an order awarding the plaintiffs Stowers and Ballard back pay in the amounts of $6,136.19 and $3,880.89, respectively, and allowable expenses totaling $1,933.20 and $882.40, respectively. Stowers, Ballard, and Batts were each awarded $10,000 in general damages for "embarrassment, humiliation, [and] mental anguish" under Section 1981.

By a separate order, the court denied the plaintiff Stowers's individual motion for relief from judgment on her discharge claim.

Thereupon, the defendants below appealed from the judgment of the district court to this court. The plaintiffs cross-appealed from the portion of the district court order limiting each plaintiff to $10,000 in damages under Section 1981, and from the denial of the plaintiff Stowers's motion for relief from judgment.

## II

Fundamentally, all the plaintiffs complained that their employment opportunities were limited as a result of their race, based on their interpretation of various incidents in the course of their employment concerning working practices, promotion and work assignment opportunities. As indicated in our discussion of the facts below, it was clearly erroneous for the trial court to find a discriminatory animus in these events, rather than the normal frictions that occur in any employment relationship.

Plaintiffs Ballard and Stowers also allege that they were terminated based on their race or in retaliation for protected activity, rather than based on legitimate, non-discriminatory, business reasons.

Because we think it will be clearer if the allegations concerning each plaintiff are not set out together, we will treat each one in a separate section.

■ *Mr. Napolean Batts.* Plaintiff Batts was hired in 1966 for a part-time job on the night clean-up crew. In 1968, he was offered an opportunity to train as a studio cameraman and then switched to the lighting department. Over the next ten years he worked in various jobs in the lighting department, culminating in being named Lighting Director on January 1, 1978. Batts points to five major incidents where the district court made findings that he contends constitute evidence of employment discrimination by the defendant corporation because of race or retaliation. These are:

1. He was required to change light bulbs when white employees were not so required.

2. He was not assigned to work at Opryland until he asked to do so.

3. He was harassed by a white employee's not fixing equipment at Batts's request after Batts was promoted to Lighting Director.

4. An article referring to a discrimination suit he filed was posted on a company bulletin board.

5. At a 1976 ceremony awarding him a 10–year service pin, a remark was made by the supervisor that the supervisor "wanted to make sure he was going to get [Batts's] employment record right, because if he didn't, he was sure [Batts] would file a lawsuit against him."

It is a remarkable feature of this case that there is really very little dispute about the factual circumstances of each of these events. The company admits that each of the first three circumstances occurred. Batts admits that when these matters were called to the attention of management, they were addressed: he was assigned to work at Opryland; all lighting employees were reminded that each of them was required to change light bulbs; and the employee who allegedly would not repair Batts's equipment was directly ordered to do so.

The district court finds it "untenable" that these incidents were not corrected until Batts complained. However, there is no evidence that management had observed any lighting employee, black or white, failing to change light bulbs, which was a task in the job description for such employees; no evidence that white employees were assigned to Opryland without asking (Batts admitted that white lighting employees were almost never sent to Opryland); and no evidence that management knew or should have known of any employee's failing to repair equipment as assigned. None of these incidents was repeated after management was informed. Thus, these incidents cannot possibly support a charge of intentional discrimination by the employing company.

Plaintiff Batts urges that his case is controlled by *Erebia v. Chrysler Plastic Prod-*

*ucts Corp.,* 772 F.2d 1250 (6th Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986). The degree of racial hostility exhibited in the *Erebia* case, which led the court to uphold the decision in favor of the plaintiff was, as the court emphasized, repeated and extreme and condoned by a management that failed adequately to rectify the situation. In that case racial slurs occurred regularly over a five-year period. Plaintiff reported the situations to three different managers who did nothing or insulted or threatened plaintiff. In this case, the individual items consist of five isolated incidents over a six-year period. Each incident either was not brought to the attention of management, or did not continue after it was.

With regard to the last two incidents, it is undisputed that there was no evidence as to who posted the article and that the bulletin board was an open one. In addition, there was no derogatory or additional comment on the article. Again, it was clearly erroneous to assign discriminatory animus or motive to management for this event. The article was neutral on its face, and did refer to an employee at WSM. Absent some indication that management posted the article for discriminatory reasons, permitted it to remain despite contrary rules, or ignored complaints about it, there is no basis for the district court's finding.

Finally, the record clearly shows that the incident at the 10–year pin ceremony occurred in 1976, 2 years before the filing of the 1978 lawsuit which the district court assigns as the motivation for the remark. We are at a complete loss to understand how the remark, even if badly motivated, could be in retaliation for future events. Thus, this finding too is clearly erroneous.

There is thus no credible evidence that would support the district court's finding of intentional discrimination with regard to Batts.

■ *Ms. Nettie Stowers.* Nettie Stowers was hired in 1973 as Community Relations Coordinator to improve communication with the black community. She was made the co-host of a program called "Urban League Speak–Out" and later was host of

her own program called "Ebony Spectrum." After a considerable series of arguments over Stowers's activities and attitude toward the station and fellow workers, Stowers was fired in August 1978, allegedly for altering receipts to increase her expense reimbursements and making personal phone calls charged to the station. Stowers denies that these practices were excessive and alleges that this firing was in retaliation for making a discrimination complaint, and that any reason for the firing was a mere pretext.

With regard to plaintiff Stowers, the court's principal findings favorable to her were:

1. Stowers was given insufficient training. Even though the court did not question that station officials believed that she received more training than any other employee at the station, WSM should have known that she needed more training than other employees. Also, she received less on-camera training than employees in the news unit, and thus was discriminated against.

2. Her job was not clearly defined, and she received insufficient direction. Thus her low job ratings and consequent omission of pay increases were unjustified and discriminatory.

3. After she filed suit, she was harassed by "a stream of memos" and closer supervision from her new supervisor, Syd Oliver. Oliver took over the station and began sending memos in March 1978, 2 months before she filed suit, but shortly before she received her EEOC right-to-sue letter.

4. The low performance ratings Stowers received in 1974–76, and the consequent failure to receive pay raises, were motivated by race, not by actual evidence of unsatisfactory performance; however, any claims based on those low job ratings were barred by the statute of limitations. She did receive pay increases thereafter.

Here again, the factual events are not really in dispute. It is undisputed that Stowers was hired at an increase over her previous salary of more than 20%, and given a role as on-the-air talent in her own program. Later, she was given community affairs responsibilities, higher pay and the secretary and office of the former holder of those duties who departed. She continually was encouraged, advised and criticized on improving her performance of her duties. It simply is not consistent with the record to conclude that defendants' conduct in relation to Stowers, after specifically recruiting her, maintaining and enhancing her position as liaison to the black community, was at the very same time discriminatory because of normal employer supervision.

It is also undisputed that Mr. Oliver, the new station manager who took over in 1978, communicated more by memos than by verbal instruction, in contrast to the style of the previous manager. There was evidence that he communicated in this fashion with many other employees, and that this communication began several months before the filing of the suit which was allegedly the motivating factor for the treatment. Even though the district court notes that investigation of Stowers's EEOC complaint may have occurred before the change in management, there is no evidence that Oliver's manner was different toward other employees.

Stowers also complains of the court's decision that her termination was based on her knowingly altering charge receipts in order to obtain unjustified reimbursement, rather than in retaliation for her participation in this discrimination suit. Stowers contends that under an appropriate standard for review of retaliation cases, *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370 (6th Cir.1984), her claim of retaliation would have been upheld. The district court did at one point state that "participation in this Title VII case played a part in, was a substantial factor for or was a principal, although not the sole, reason for the defendant's discharge of Stowers." Despite this uncertainty over the degree of the impermissible motivation, it specifically stated that "because of the plaintiff's admitted falsification of expense records the defendant WSM–TV would have discharged her despite her participation in this case." This is precisely the standard that this court adopted in *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 712 (6th Cir.1985). In

that case we stated that if there were "a preponderance of the evidence that the employer's decision to take an adverse employment action was more likely than not [improperly motivated], the employer has the burden to prove that the adverse employment action would have been taken even in the absence of the impermissible motivation...." *Id.* This is precisely what the district court found in this case, and the district court therefore did not err in denying Stowers's motion for relief from judgment.

■ *Ms. Lenore Ballard.* Lenore Ballard worked as a videotape technician and editor trainee for Opryland beginning in January 1977 and later for WSM since June 1977. She contends the company failed to train her properly and would not let her work on more complex equipment. The company contends that no trainees were given formal training and that she was offered an electronics training course on company time beginning in late 1977. However, Ballard repeatedly was observed reading other materials and visiting the park rather than attending the training course. Ultimately, she was fired in April 1978, for failing to attend the course without notifying her superiors.

In the case of Ballard, the key findings by the district court are:

1. Ballard was not provided with training opportunities in her job as a "videotape trainee."

2. Her ultimate termination in reliance on her "not working" was pretextual because:

a. She didn't have enough work to do, in any event; and

b. Her actions were consistent with those of white employees who were not fired.

However, the record is clear that there was no training program for any employees in the videotape unit; that Ballard was given the opportunity to attend an electronics course, a necessary skill for advancement in videotape, at company expense and with pay on company time; that she instead missed many classes, turned in her books to her instructor, telling him that she didn't have time to study, yet she spent many hours visiting the park at Opryland, and reading non-class materials when she was supposed to be in class. When management learned of these events, she was legitimately terminated. There was no evidence whatsoever as to the conduct of white employees in similar circumstances. Some experienced white employees did not complete the course, but there is no evidence that any failed to attend the course while taking company time and money to do so. Certainly, as a general matter, it is not pretextual for management to fire an employee who is not attending training which the company is providing and paying for, on company time, and paying the employee for attending.

### III

A district court's finding of fact may not be set aside lightly, nor because of a mere difference of opinion as to credibility. Those findings may not be disturbed unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *EEOC v. High Top Coal Co.,* 677 F.2d 1136 (6th Cir.1982) (per curiam). However, "findings that are unsupported or arbitrary" should be set aside. *Sweeney v. Board of Trustees,* 604 F.2d 106, 109 n. 2 (1st Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980). " '[A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)); *accord, Jackson,* 743 F.2d at 374. Under such circumstances a reviewing court has the power, and the duty, to overturn findings of a district court.

As outlined above, we are left with such a "definite and firm conviction" in this case. We are not called on to weigh credibility here. The factual findings as to the existence of events, except as noted in a few items, are correct. It is the inference of discrimination from scattered and unexceptional incidents that cannot stand. As the Supreme Court has stated:

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511 (citations omitted).

Here, the district court's account is not "plausible in light of the record viewed in its entirety."

The district court specifically rejected most of the crucial elements and most damaging assertions of the plaintiffs' case. However, perhaps in a spirit of "splitting the difference," the court then interpreted some relatively undisputed incidents as evidencing the discriminatory animus and disparate treatment necessary to support a charge of discrimination, albeit for a much lesser amount of damages than plaintiffs sought. The record compiled in this case does not amount to more than the type of employee dissatisfaction which is common to all employment and, in the cases of Stowers and Ballard, fully justified employer reaction to instances of clear violations of an employee's duty of honesty and diligence.

While there may have been facts that would have justified the district court in concluding that the defendants' employment practices could have been improved from the point of view of employee management, such failings do not demonstrate discrimination, in the absence of some showing of disparate treatment. Thus, the structuring of Stowers's community relations job as an "evolving" one, and without the same on-camera training as full-time news department employees; the change in station managers to one who communicated more by memos than in person and who desired to exercise more direct follow-up on employees; and the employment of a videotape trainee with the initial expectation that most learning would be by on-the-job training; these could all be questioned as matters of management practice.

In the absence of any credible findings that such practices were disparate as between black employees and white employees, however, such observations, however accurate, will not support a charge of discrimination. The ultimate question to be resolved is whether the employer treated "some people less favorably than others because of their race," *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), not whether the employer treated an employee less favorably than someone's general standard of equitable treatment.

Based upon the foregoing, there are not sufficient facts correctly found to justify the judgment entered by the district court in favor of plaintiffs. That judgment is therefore REVERSED. The district court's denial of Stowers's motion for relief from judgment is AFFIRMED.