**Antoine J. BELL, Plaintiff–Appellant,**

**v.**

**CHESAPEAKE & OHIO RAILWAY COMPANY, a foreign corporation, Defendant–Appellee.**

**No. 89–2204.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 9, 1990.

Decided Jan. 17, 1991.

**221**

Robert Van Cleef (argued), Becker & Van Cleef, Southfield, Mich., for plaintiff-appellant.

Mary C. O'Donnell (argued), Driggers, Schultz, Herbst & Paterson, Troy, Mich., for defendant-appellee.

Before GUY and BOGGS, Circuit Judges, and GRAHAM,* District Judge.

PER CURIAM.

Antoine Bell sued his employer, the Chesapeake & Ohio Railway Co. (CSX), for employment discrimination in state court. Bell alleged that CSX had tolerated acts of discrimination against him by his fellow employees and thus had created a racially hostile work environment in violation of Michigan's Elliott–Larsen Civil Rights Act, M.C.L.A. § 37.2101 *et seq.*, M.S.A. § 3.548(101) *et seq.* Bell sought money damages for the psychological damage he alleged he sustained as a result of this atmosphere. All but one of the five allegedly discriminatory actions took place outside the three-year statute of limitations of the Elliott–Larsen Act. Bell maintained that the statute was no bar to recovery for all five acts since all of them taken together constituted continuing violation of the anti-discrimination laws.

CSX subsequently removed the action to federal court. Bell was deposed on June 13, 1986. On the following June 24, CSX moved for summary judgment on the basis

of Bell's deposition testimony, arguing that Bell had brought a prior suit in state court that was dismissed with prejudice and that the previous case was res judicata between the parties as to claims arising out of racial discrimination in the workplace. The motion was denied.

On September 26, CSX presented to the court two documents, one styled "Motion and Brief in Limine to Exclude Time-barred and Prior Litigation Incidents," and the other entitled "Defendant's Trial Brief." On the basis of Bell's deposition testimony, the former motion set forth the six acts that constituted the alleged racial harassment and an account of the response of CSX's management. The purpose of the motion was to "preclude [p]laintiff from introducing into evidence or from questioning [p]laintiff in any way regarding ... the five incidents of racial harassment/discrimination which occurred outside the limitations period." Bell responded with a "Memorandum on Admissability (sic) of Various Acts of Racial Discrimination." Bell's responsive memorandum took no exception to CSX's statement of facts.

When the trial began on September 26, the court did not rule on the defendant's "motion in limine" immediately, but instead permitted Bell to make an opening statement. Immediately thereafter, it granted CSX's motion, thereby excluding five of the six acts of alleged discrimination from the jury's consideration. Once this had been done, the court went on to dismiss the case, holding that the sole surviving incident relied on by Bell was not actionable under Michigan law. 724 F.Supp. 489.

We affirm the results reached below. We note that the dispositive issue in the case is not the admissibility of the evidence of incidents of racial harassment occurring outside the statute of limitations. Rather, the proceedings below demonstrate that there is no genuine issue of material fact between the parties and that on the undisputed facts, Bell has failed to state a cause

---

* The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

of action under the continuing violation theory. Hence, CSX is entitled to judgment as a matter of law. Therefore, we treat the trial court's disposition of this case as a summary judgment. The error in nomenclature of the parties below does not affect our review of the case. As an appellate court, we are not bound to adhere to the label attached to the trial court's disposition of the case and may treat it as a summary judgment. 5A C. Wright & A. Miller, Federal Practice and Procedure § 1366 at 497 n. 20 (West 1986) (collecting cases). The trial court cannot be faulted for giving summary judgment effect to defendant's misnamed motion, unless Bell was prejudiced thereby. *See Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 393 (6th Cir.1975). Bell responded to CSX's "motion in limine" with his own motion. The argument he presented there, which is the same as the one he pursues on appeal, represents his mature legal position. Hence, we find irregularity, but no prejudicial error, in the proceedings below.

## I

The acts of discrimination and harassment Bell complains of began soon after he was hired in July 1977 and continued until the events in 1986, which proximately lead to the filing of this suit. The following account of them, except for the second and sixth incidents, is taken from Bell's appellate brief and his opening statement, as the sources of evidence most favorable to him. For our knowledge of the second and sixth incidents, we rely on the trial court's opinion and order, and the "motion in limine" of CSX, whose recitation of the facts in this case has not been challenged by Bell. We emphasize that no genuine dispute of fact exists in this case, and that we rest our judgment on allegations construed in a light most favorable to Bell.

1. Shortly after Bell was hired, he "was confronted by a [General Motors supervisor at a yard to which he was assigned] who fabricated a charge that [Bell] was not working properly. This white supervisor's inexplicable rage escalated until he charged and assaulted [Bell]. Plaintiff was certain that this man acted out of racial hatred[,] not so much because of any words, but due to his motions and gestures. The next day [Bell] reported the incident to ... his C & O supervisor. He was told to take a couple of days off."

Shortly thereafter, "Bell was made to transfer to another [CSX] facility in Wayne, Michigan." Bell complains that "no public or official condemnation of bigotry occurred." At Wayne, a co-worker told him that "things [there] were no different than at [the General Motors facility from which he had come]."

2. The next incident occurred in 1981, when Bell alleges that the seniority system was skewed by the union and CSX to favor whites over blacks.

3. "During Christmas, 1982, [Bell] worked third shift, midnights, when he found a KKK recruiting poster on the bulletin board in the employees gathering room at the Rougemere Yard.... He informed [the] trainmaster within four to five hours.... [The trainmaster] told him not to pay any attention to it. It was not until this conversation that the poster was removed. In an effort to get [CSX] to make a public response, [Bell] contacted his union representative and the [CSX] foreman. ... However, the C & O took no discernible action other than [to] take the posters down. The KKK literature added to the atmosphere of racial intimidation. The incident interfered with [Bell's] ability to work the midnight shift."

4. "In 1983 and [19]84, there were incidents where co-employees used racial epithets, racial obscenities, ... [like] the word nigger or black son-of-a-bitch, toward him. And when he reported those incidents, nothing was done and he was told to ignore it."

5. "[I]n 1984 [or perhaps 1983,] he was assaulted by a white worker in a lunch room where that white worker yelled out loud, 'I hope the KKK kills all the niggers.' And then rushed ... Bell in this crowded lunchroom and pushed him against the locker. To defend himself, ... Bell ... struck back against this white worker. The response of [CSX was to say to Bell

and to his assailant:] '[There is to be no] racial hostility or racial conduct ... here at the work place.... Go make up. Don't let it happen again.' "

6. In the late summer or early fall of 1986, the same KKK posters that had appeared in 1982 again showed up next to Bell's locker and seemed to be directed towards him. Bell took the posters to a foreman, who again told him to ignore them.

On June 30, 1987, Bell filed this action. Only the last of the incidents he complains of falls within the three-year statute of limitations of the Elliott–Larsen Act.

## II

█ The doctrine of "continuing violation," a modification of the law affecting the statute of limitation in civil rights cases, was adopted by the Michigan Supreme Court in the consolidated cases of *Sumner v. Goodyear Tire & Rubber Co., Knight v. Blue Cross/Blue Shield of Michigan,* and *Robson v. General Motors Corp.,* 427 Mich. 505, 398 N.W.2d 368 (1986). As the court noted, the doctrine was developed by the federal courts in the context of Title VII of the federal Civil Rights Act. *Id.* at 525, 398 N.W.2d at 376. In the late 1960's, federal courts began to refuse to dismiss cases automatically where the complaint had not been filed in a timely fashion. *Id.,* 398 N.W.2d at 377. These courts were concerned that a number of factors militated against a strict application of the limitation requirement. *Id.* at 526, 398 N.W.2d at 377. The most important, both generally and for present purposes, is that many discriminatory acts occur in such a manner that it is difficult to define precisely when they took place. *Ibid.* One might say they unfold rather than occur. *Ibid.* Application of this doctrine to the present case is appropriate since Bell alleges that the hostile racial environment that damaged him psychologically developed over the years out of a series of incidents.

█ In order to show that ostensibly discrete acts are a continuing violation, a plaintiff must be prepared to demonstrate 1) a policy of discrimination, 2) a continuing course of conduct, and 3) the present effects of past discrimination. *Id.* at 528, 398 N.W.2d at 378. Before this is done, a threshold requirement must be met. The plaintiff must show a "present violation," *i.e.,* a discriminatory act within the limitation period. *Id.* at 527, 398 N.W.2d at 377.

The first element of a continuing violation involves allegations that an employer has engaged in a policy of discrimination. *Id.* at 528, 398 N.W.2d at 378. In such a case, the employee presents a challenge not only to discriminatory conduct that has affected the employee, but also, or alternatively, to the underlying employment system. *Ibid.* The second element requires that an employee challenge a series of allegedly discriminatory acts that are sufficiently related to constitute a pattern, at least one of which occurred within the limitation period. *Ibid.*

The third *Sumner* element, which might be called the permanence rule, or the discovery rule, requires some explanation. It was devised to deal with a situation, resembling ours, where only the last of a series of discriminatory acts allegedly constituting a pattern is within the statute of limitations. The permanence element seeks to differentiate between: 1) the continuing effects of past discrimination that is no longer actionable because of the statute of limitations, and 2) a discriminatory act that was part of a pattern and which brings to the attention of the victim the fact of the continuing violation. *See generally id.* at 528–33, 398 N.W.2d at 378–80.

In construing the third element, the district court in this case relied on *Berry v. Board of Supervisors of Louisiana State University,* 715 F.2d 971 (5th Cir.1983), reasoning that the Michigan Supreme Court had employed *Berry*'s mode of analysis in deciding *Sumner.* According to *Berry,* the inquiry required by the third element is "whether the act [has] the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued

existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate.". 715 F.2d at 981.

The facts of *Berry* show the need for the rule and illustrate its application. The case involved a female university professor who had a heavier workload than her male counterparts. She was permitted to sue on the basis of actions that occurred outside the limitations period because it was not obvious that she was the victim of a discriminatory policy until she had been on the payroll for a few years with a heavy course load while those of her male counterparts were lighter. In other words, the worker did not—and could not—become aware of the need to take legal action to vindicate her rights until a period of time had elapsed. Hence, application of the third element of the continuing violation doctrine requires the court to determine when the plaintiff discovered he was a victim of a continuing policy or pattern of discrimination. Acts occurring before that date and outside the statute of limitations are barred as the basis for a cause of action, unless the plaintiff can demonstrate that they are the results of a policy and at least one act occurred within the limitations period.

### III

In applying the first element of the continuing violation doctrine, the trial court held that the plaintiff had not alleged, and had made no showing that he could prove by a preponderance of the evidence, that the harassment directed against him by his co-workers was part of a policy by his employer, CSX. According to the court, the acts complained of were not committed by individuals acting within the scope of their employment; one was employed by General Motors, not CSX. Before this court, Bell responds that the thread which weaves all these incidents together is that they all came from the same source, racial hatred, and that CSX did nothing about them, thereby tolerating the resulting racially hostile environment.

▮ In order to hold an employer liable for harassment by its employees, a worker has the burden of establishing *respondeat superior* liability by proving that the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to implement prompt and appropriate corrective action. *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 483 (6th Cir. 1989); *Langlois v. McDonald's Restaurants of Michigan, Inc.*, 149 Mich.App. 309, 313, 385 N.W.2d 778, 780 (1986). Plainly, an appropriate corrective response will vary according to the frequency and severity of the alleged harassment. *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986), in which we found an employer liable for racial harassment by its employees, and *Batts v. NLT Corp.*, 844 F.2d 331 (6th Cir.1988), where we came to the opposite conclusion, provide a matrix for evaluating Bell's assertion that CSX's response was inadequate. In *Erebia*, the degree of racial hostility exhibited toward the plaintiff was repeated and extreme. *See generally* 772 F.2d at 1252–53. Racial slurs occurred regularly over a five-year period. Plaintiff reported the situation to three different managers, who did nothing or insulted or threatened the plaintiff. In *Batts*, however, the plaintiff complained of such acts as 1) being required to change light bulbs when white employees in his job category were not required to do so; 2) not being given a more desirable work assignment until he requested it; 3) the failure of a white employee to follow his instructions after he was promoted to a supervisory position; 4) the posting, on the company's bulletin board by anonymous persons, of an article reporting an anti-discrimination suit the plaintiff had filed; and 5) finally, jokes by a supervisor at a company function about plaintiff's putative propensity to file anti-discrimination suits. 844 F.2d at 334. The court held that these "were isolated incidents over a six-year period. Each incident either was not brought to the attention of the management, or did not continue after it was." *Ibid.*

We consider this case much closer to *Batts* than to *Erebia*. The incidents of which Bell complains were isolated occurrences over a nine-year period. CSX did intervene at times to ease the racial tensions between Bell and his co-workers. According to Bell's deposition, after the fight reported above as incident five, both men were taken aside by their supervisor and admonished in his office. CSX officials also removed KKK posters when Bell complained about them, and there is no contention that the officials were aware of them previously. These actions may fall short of what Bell would have liked the company to do. Nonetheless, they are not evidence of a policy of encouraging racial hostility in the workplace or of culpable indifference toward it, but of an opposite policy. We conclude, therefore, that as a matter of law, CSX bears no *respondeat superior* liability for the incidents complained of.

In applying the second element, the trial court relied on *Berry* to hold that it must consider the subject matter of the acts, their frequency, and the degree of permanence before concluding that they constituted a continuing course of conduct. *See* 715 F.2d at 981. In the opinion of the trial court, the acts complained of, occurring as they do over the span of nine years, were too infrequent to be characterized as a "continuing course of conduct" as a matter of law. We can find no fault in this reasoning.

Finally, with respect to the third element of the *Sumner* doctrine, the court held that each of the acts Bell complained of should have made him aware that he had suffered injury, thereby imposing on him the duty to bring his action within the limitations period. For example, the 1982 incident involving the KKK poster was plainly an act of racial hostility. It is inconceivable that Bell did not know that he was a victim of racial harassment at that time, since he complained about it to his superiors. Bell maintains that he took no other action—including legal action—at that time because he had decided that the best way to handle racial hostility encountered at work was to keep a low profile. If so, his failure to bring timely suit was a result of his own decisions, not a failure to apprehend injury.

For the foregoing reasons, we conclude that the trial court, as a matter of substantive law, properly applied the doctrine of the continuing violation to this case. As our exposition of the doctrine shows, the difficulty that the doctrine raises for this plaintiff is not a matter of evidentiary law. Bell has failed to plead a continuing violation and therefore has stated no claim on which the court may grant relief, with respect to the first five incidents.

We now turn to the sixth incident of alleged harassment, which took place within the limitations period. Bell makes no allegations sufficient to support a finding that *respondeat superior* liability should be imposed on CSX for the posters to which he quite justifiably took offense. This incident occurred more than three years after the first poster incident and more than a year after the fifth incident. Bell provides no grounds for concluding that the response of CSX officials to this incident constituted creation or toleration of a racially hostile environment, given that a response was made and that the incident has the same isolated character as the incidents of harassment in *Batts*.

## IV

CSX also argues that another suit filed by Bell but dismissed with prejudice is res judicata between himself and it on matters of racial discrimination. In view of the results we have reached above, it is unnecessary to consider this argument further.

## V

For the foregoing reasons, the judgment below is AFFIRMED.