### Ada T. ANDERSON, Plaintiff,

v.

### MEMPHIS CITY SCHOOLS BOARD OF EDUCATION, Defendant.

#### No. 98–2332–V.

United States District Court,
W.D. Tennessee,
Western Division.

Sept. 14, 1999.

Sandra C. Isom, Memphis, TN, Counsel for Plaintiff.

Ernest G. Kelly, Jr., Memphis, TN, Counsel for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

VESCOVO, United States Magistrate Judge.

Plaintiff Ada Anderson, an African–American woman, sued the City of Memphis Board of Education ("the Board"), claiming that it discriminated against her on the basis of her race and gender in violation of Title VII, 42 U.S.C. §§ 2000e to e–16 (1994). Before the court[1] is the Board's Motion for Summary Judgment. For the reasons that follow, the Board's motion is GRANTED.

## I. BACKGROUND AND UNDISPUTED FACTS[2]

Plaintiff Ada Anderson was employed by the Board as a teacher of special education children at Frayser High School from at least 1993 until she took a disability leave on November 11, 1997.[3] Richard Hebert was employed at Frayser High School as the supervising building engineer from at least 1981 until his resignation on or about May 6, 1997, although he took a continuous leave of absence for personal illness from October 30, 1995, to October 18, 1996. (Ricks Mason, Jr. Aff. ¶¶ 2–3.) Both parties agree that Hebert had no supervisory authority over plaintiff; she reported directly to the principal of the school.[4] At most, plaintiff and Hebert were co-workers. The essence of plaintiff's Title VII complaint is that Hebert made offensive comments to her, directed threatening physical gestures toward her, and that her supervisors failed adequately to respond to her requests for assistance.

Plaintiff points to a number of alleged events in support of her claim that Hebert harassed her because of her race and gender. She begins her list of grievances with a 1981 event in which Hebert allegedly referred to the children of a fellow employee by a racial slur after he treated them rudely. (Cassandra Turner Dep. at 11–12.) Plaintiff also claims that Hebert used the phrase "you people" in talking to an African–American employee in 1981. (Turner Dep. at 13–14.) Plaintiff was not involved with either of the 1981 incidents nor were these incidents reported to any administrator at Frayser.

The first complaint that plaintiff made to any administrator at Frayser about Hebert's behavior came in 1993 or 1994. Plaintiff alleges that she told the principal, Becky Howard, that Hebert had used racial slurs and acted in an offensive man-

1. The parties have consented to the trial of this matter before the undersigned United States Magistrate Judge.

2. The court's task in discerning the undisputed facts has been made more difficult because of both parties' failure to comply with Local Rule 7.2(d)(2) and (3). That rule provides that the proponent of a motion for summary judgment must designate by "serial numbering each material fact" upon which he relies. The rule likewise provides that the opponent of a motion for summary judgment "who disputes any of the material facts ... shall respond to the proponent's numbered designations, using the corresponding serial numbering ...." Although defendant in the present case did number its material facts in the Motion for Summary Judgment, it did not do so in the memorandum. Plaintiff failed entirely to use "corresponding serial numbering." For purposes of this summary judgment motion, the court has assumed that the facts as stated by the plaintiff are true, and has construed all inferences that permissibly may be drawn from the facts in the light most favorable to the plaintiff. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see also II.A., infra (discussing standard for summary judgment).

3. Plaintiff's leave was unrelated to the circumstances giving rise to this lawsuit.

4. It is not clear who supervised Hebert. Plaintiff testified that Hebert was in a separate area of Personnel, "the ServiceMaster Department." (Pl. Dep. at 61.)

ner.[5] (Pl. Dep. at 54–55.) When pressed for details, the only specific racial slur plaintiff identified was "you people." (*Id.* at 56.) Plaintiff claims that Howard laughed about Hebert, told her to come directly to the principal if she had any problems with him, and referred to him as "just an old racist, white man." (*Id.* at 55.)

Plaintiff alleges two negative encounters with Hebert in August 1995. Plaintiff claims that one day in August 1995 during in-service training, Hebert brushed against her while she was bent over putting her lunch into a refrigerator in Hebert's office and made a sexually suggestive comment toward her.[6] (Pl. Dep. at 97–98.) She concedes that she never mentioned this event to the principal or any other school administrator or filed a complaint about the matter. In addition, plaintiff claims that around that same time Hebert cursed her in response to her request to move furniture from a storeroom into her classroom. Later, while plaintiff was attempting to move the furniture herself, Hebert blocked her access to the storeroom by slamming and locking the door. (*Id.* at 86–92.) Plaintiff testified, however, that on the same day she observed Hebert moving furniture for another female teacher, the home economics teacher.[7] (*Id.* at 86–92.) Plaintiff claims that two or three days later she indirectly mentioned this incident to the acting principal, Dr. Frederic Brooks, by asking him if he had given her permission to move the furniture.[8] (*Id.* at 90–91.) There is no proof that she informed Dr. Brooks that Hebert had refused to assist her or blocked her access to the furniture. Dr. Brooks offered to have someone move the furniture for her.

Neither of these events in August 1995 spurred plaintiff to take legal action. However, on or around September 7, 1995, plaintiff and Hebert engaged in a confrontation that led to the complaint with the Equal Employment Opportunity Commission ("EEOC"), and eventually to the case at bar. That afternoon, a female student at the school vomited in a bathroom near plaintiff's classroom. After the student was taken to the hospital, plaintiff told Hebert to clean the bathroom. Hebert became irate, cursed at plaintiff, told plaintiff "I don't need nobody telling me how to do my damn job," (Pl.'s Mem. in Opp'n. to Def.'s Mot. for Summ. J., Ex.5.) and according to plaintiff, "walked toward [her] with his hand back like he was going to strike [her]." (Pl. Dep. at 46.) Plaintiff filed a written complaint with Dr. Brooks that afternoon, her first written complaint of any sort about Hebert.

By all accounts, Dr. Brooks held a meeting with plaintiff, two Memphis Education Association (MEA) representatives, and Hebert on September 9, 1995, two days after the confrontation. During that meeting, Hebert claimed that the confrontation had been "blown out of proportion." Nevertheless, Dr. Brooks issued a formal letter of reprimand to Hebert on September 12, 1995, and sent a copy of the letter to the Memphis City Schools Personnel Office. (Frederic Brooks Aff., Exh. B.) Hebert laminated the letter of reprimand and posted it in his office. When plaintiff notified Dr. Brooks that she was offended by the posting of the letter, he immediately instructed Hebert to remove the letter, and Hebert complied. (Brooks Aff. ¶ 7 .) As part of the resolution of this matter, Dr. Brooks also asked both plaintiff and Hebert to avoid each other. As plaintiff points out, the closest telephone to her classroom was in Hebert's office,[9] and ac-

---

**5.** Becky Howard was principal of Frayser during the 1994–1995 school year.

**6.** Plaintiff testified Hebert said, "I could— damn, I could ride that ass like Lone Ranger riding Silver." (Pl. Dep. at 97.)

**7.** There was no testimony concerning the race of the home economics teacher.

**8.** Following Howard's departure, Dr. Brooks served as acting principal at Frayser for the 1995–1996 school year.

**9.** In addition to the phone, Hebert's office also had a microwave, refrigerator, bathroom and coffee pot, as did the teacher's lounge. Because Hebert's office was closer to her classroom than the teacher's lounge, plaintiff preferred to use Hebert's office. Plaintiff testified, however, that she was the only teacher

cording to plaintiff, as a special education teacher the law required her to have access to a phone. In response to plaintiff's complaints, the school eventually installed a private phone line in plaintiff's classroom.

Plaintiff points to another episode in September 1999 to corroborate her claim that Hebert harassed her on the basis of her gender and race. Plaintiff claims that on September 11, 1995, she was returning with her class from a fire drill when she encountered a closed door. Hebert saw her and swung the door open with more force than necessary, frightening her. (Pl. Dep. at 119–122.) Plaintiff submitted a written complaint three weeks later, on October 13, 1995.[10] (Brooks Dep. Exh. 3.) Dr. Brooks indicated that he received this complaint on or about November 4, 1999 after Hebert had taken a leave of absence from the school, that he investigated plaintiff's allegations, but that he was unable to substantiate them. (Brooks Aff. ¶ 11.)

In addition, plaintiff testified in her deposition to a variety of other interactions with Hebert. Although the time period during which these additional interactions occurred is vague, it appears they took place after he was reprimanded and before he took his first leave of absence. Plaintiff did not report these to Dr. Brooks or to any other administrator. The claims include allegations that (1) Hebert blocked plaintiff's access to a gym door at the school causing her to have to walk around the building to another door, (2) that he disconnected a phone call she was making to a doctor, (3) that on one occasion he carried a set of bolt cutters while he walked behind her in a hallway, and (4) that he mumbled offensive comments when she was nearby.

On September 26, 1995, plaintiff filed a complaint with the EEOC. The EEOC complaint listed the earliest date of discrimination as August 21, 1995.

In a series of broad allegations, plaintiff points to disputes that other teachers had with Hebert as evidence of his racist tendencies. On September 22, 1995, Ms. Billie House, a Teacher's Assistant at Frayser, wrote to Dr. Brooks, complaining that Hebert had told her that he was at work because he could not "be on the Welfare Line." (Brooks Dep. Ex. 4.) Ms. House apparently believed that Hebert intended this comment to be both insulting and racist.[11] In three separate letters dated October 26, 1995, three teachers indicated that they had been involved in negative encounters with Hebert. Ms. Wilmah Foster wrote a letter "to whom it may concern" about an incident in Spring 1995 when Hebert allegedly turned off the power to her classroom because of the noise her students were making. (Brooks Dep. Exh. 7.) When Foster called Dr. Brooks to report the loss of power to her classroom, Brooks called Hebert, who immediately fixed the problem. Foster's letter also discussed the "fire drill" incident of September 1995. The letter stated that Hebert "peered out the door" and, after seeing her, "swung [the door] open with such force as to knock me nearly down." (Brooks Dep. Exh. 7.) Interestingly, Foster did not mention that plaintiff was present during that event. Ms. S.P. Williams wrote a letter "to whom it may concern" claiming that Hebert had cursed at her in August 1995 while she was moving furniture. (Brooks Dep. Exh. 8.) Finally, Ms. Tanya Walk wrote a similarly-addressed letter claiming that Hebert had told her that "Mark Furman is my kind of man."

---

Hebert refused entrance, "I can't go into the room. I can't use the bathroom. I can't put my food in the refrigerator. We have 58 teachers. All 57 can do it, but I can't." (Pl. Dep. at 92.)

10. Plaintiff "thinks" she had previously verbally advised Dr. Brooks of the incident. (Pl. Dep. at 121.)

11. The court assumes for purposes of this decision that a jury might find that Hebert's comment about welfare was racially motivated. In fairness, however, the statement in context, appears innocuous, albeit tasteless.

(Brooks Dep. Exh. 9.) Dr. Brooks received the three letters on or about November 4, 1995. (Brooks.Aff.¶ 11.)

On October 30, 1995, Hebert took a leave of absence. While Hebert was on leave in early 1996, plaintiff claims that she saw him on campus and complained to Dr. Brooks. Dr. Brooks instructed Hebert to turn in his keys to the building, which he did. (Brooks Aff. ¶ 10).

Hebert was absent from Frayser for nearly one year, returning October 18, 1996. Upon his return, Hebert was placed in a different part of the school building, where he worked until his resignation on May 6, 1997. Although plaintiff informed the new principal, Dr. Green, that she was bothered by the fact that Hebert had returned to the campus, there is no indication that Hebert had any interactions with plaintiff after his leave began on October 30, 1995.

The Board had in place a policy forbidding both sexual and racial harassment.

Plaintiff claims that she suffered damages because Hebert continued to work at the high school. She missed several days of work, which she attributed to the "excess physical and mental stress from Mr. Hebert," and she suggested that she might decide to transfer to another school. (Brooks Dep. Exh. 4.) Plaintiff seeks compensation for medical expenses, mental anguish, and the "sick time" that she took following her interactions with Hebert.

## II. ANALYSIS

The Board argues that it is entitled to summary judgment because the plaintiff has failed to introduce any evidence from which a reasonable jury could find that she has met her prima facie burden. Specifically, the Board maintains that plaintiff is unable to prove two essential elements of a Title VII gender or race claim: (1) that the harassment in question was severe and pervasive; and (2) that the Board's remedial action was insufficient and unreasonable.

In response, plaintiff insists that a genuine issue of material fact exists concerning whether she was subjected to a hostile work environment. Plaintiff also contends that a genuine issue of material fact exists regarding whether the Board took appropriate remedial action.

### A. Summary Judgment Standard

A motion for summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993); *see also Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs.*, 979 F.2d 1131, 1133 (6th Cir.1992) (per curiam). The moving party has the burden of showing that there are no genuine issues of material fact as to an essential element of the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *LaPointe*, 8 F.3d at 378; *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1389 (6th Cir.1993); *Guarino v. Brookfield Trustees*, 980 F.2d 399, 405 (6th Cir.1992). If the moving party meets this burden, the nonmoving party must then present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339–40 (6th Cir.1993). The nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). A mere factual dispute is not enough to preclude the granting of an otherwise proper motion for summary judgment; the key is whether the disputed fact is material and the dispute itself is genuine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a motion for summary judgment, "this court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir.1993) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505). The evidence, all facts, and any inferences that permissibly may be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Finally, a court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *See Adams v. Metiva,* 31 F.3d 375, 378 (6th Cir.1994).

B. *Title VII Analysis*

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's race [or]... sex...." 42 U.S.C. § 2000e–2(a)(1). Plaintiff alleges that defendant violated Title VII by subjecting her to a hostile work environment because of both her sex and race. In *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court recognized that a hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ...." *Id.* at 21, 114 S.Ct. 367. (internal citations and quotation marks omitted). *See also Burlington v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. Boca Raton,* 524

U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (reaffirming the "severe and pervasive" test).

■■ To prove a prima facie case of a hostile work environment based on either sex or race, plaintiff must establish the following five elements: (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on her gender and/or race; (4) the harassment created a hostile work environment; and (5) the existence of employer liability. *See, e.g., Williams v. General Motors Corp.,* 187 F.3d 553, 560–561 (6th Cir. 1999); *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999). A hostile work environment plaintiff must also meet both a subjective and an objective test. She must show that the environment "was objectively hostile, and also that she subjectively perceived it to be hostile." *Williams,* 187 F.3d 553, 564–565 (citing *Harris,* 510 U.S. at 21, 114 S.Ct. 367 and *Faragher,* 118 S.Ct. at 2283). Here, the Board attacks the fourth and fifth elements or plaintiff's prima facie case.

1. *The Hostile Work Environment*

■ In order to establish a claim for gender or race based hostile work environment, the fourth element of a prima facie case requires the plaintiff to show that the harassing actions were so "severe or pervasive" that she was subjected to a hostile work environment. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. In determining whether the work environment was hostile, the court must examine the totality of the circumstances, including the frequency and severity of the conduct; whether the conduct was physically threatening or humiliating or merely an offensive statement; and whether the conduct unreasonably interfered with plaintiff's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *see also Williams,* 187 F.3d 553, 564–565. No one factor is dispositive.

■ Plaintiff basically recites five distinct incidents which she claims were so severe or pervasive as to make her situation intolerable: (1) Hebert's sexually explicit conduct in August, 1995; (2) Hebert's refusal to move plaintiff's furniture and his attempt to prevent her from moving the furniture in August, 1995; (3) Hebert's use of foul language and threatening behavior during the bathroom clean-up incident on September 7, 1999; (4) Hebert's conduct in opening a door too forcibly during the fire drill on September 11, 1999; and (5) Hebert's laminating and posting the written reprimand on September 12, 1999. Only the last three events were reported to Dr. Brooks. Additionally, plaintiff relates four more general instances of offensive conduct which she avows took place after the September 7 fire drill incident and before Hebert's first leave of absence: (1) Hebert blocking her access through a gym door; (2) Hebert disconnecting a phone call she was making to a doctor; (3) Hebert walking behind her while carrying a set of bolt cutters; and (4) Hebert mumbling nonspecific, offensive comments when she was nearby. None of these general allegations of misconduct were reported.

While the number of incidents between late August and early October 1995 are inordinate, such conduct was brief in duration, occurring intermittently over no greater than a two-month period. Plaintiff has brought forth no evidence that Hebert had any direct contact with her after October 1995. In addition, Hebert's actions when considered both in isolation and in combination were minimally or moderately offensive and not sufficiently severe so as to alter the conditions of her employment. As far as the conduct summarized above, there is no evidence that Hebert spoke of women or blacks in derogatory or demeaning terms; the only evidence is that he used curse words. The mere use of foul

language, without more, does not automatically create an unreasonably abusive or offensive environment under Title VII. *Rabidue v. Osceola,* 805 F.2d 611, 620 (6th Cir.1986) (holding that "instances of conduct that prove equally offensive to male and female workers would not support ... a harassment charge because both men and women were accorded like treatment."). Of course, if the offensive language were racial or sexual by its nature, as occurred in *Williams,* 187 F.3d 553, men and women (or blacks and whites) would not be accorded like treatment, and a Title VII action might properly exist.[12] Plaintiff searches for direct evidence of racially obnoxious remarks by Hebert. She describes a racial slur that Hebert used in 1981, then points to a veiled complaint she made a dozen years later to Becky Howard about Hebert making an offensive comment, "you people."[13] Plaintiff makes no other specific allegations of racial slurs by Hebert. The use of racial slurs three or four times over a fifteen year period, while loathsome, constitutes the sort of "offhand comments and isolated incidents" that are not actionable under Title VII. *Faragher,* 118 S.Ct. at 2283–84. When considered as a whole, Hebert's conduct can best be described as childish or boorish outbursts in response to requests to perform work or challenges to his authority. Even though Hebert's behavior was rude, insolent, and annoying, it does not rise to the level of severity that Title VII seeks to prevent.

Second, Hebert's behavior of which plaintiff complains, for the most part, consisted of "merely offensive statement[s]," not physically humiliating or threatening behavior. In fact, the only allegation of physical contact is that Hebert "brushed" against her in August 1995. The next closest allegation of physical contact is that

---

12. In *Williams,* employees regularly welcomed plaintiff to work with the greeting "hey, slut." Nothing nearly so egregious can be found in the present record.

13. "You people" could just as easily refer to teachers. According to S. Williams' letter, while moving a desk at her request, Hebert complained of and cursed "you damn teachers." (Pl.'s Mem. in Supp. of Mot. for Sum. J., Ex. 8.)

Hebert opened a door forcibly during a fire drill. And, other than her two allegations that she was frightened because Hebert raised his hand while arguing with her and that he carried a set of bolt cutters while at the school, plaintiff has brought forth no evidence of physical threats.

Nor did Hebert's conduct unreasonably interfere with plaintiff's work performance. Although plaintiff apparently had some absences in September 1995 to seek therapy for stress which she claims was caused by Hebert's conduct,[14] her exposure to him was short-lived. Hebert had left the school by the end of October 1995. When he returned nearly a year later, he was relocated to a different part of the school building. Furthermore, plaintiff eventually received a private phone line in her office to permit her to perform her job.

Considering all of the circumstances alleged by plaintiff, the court does not find sufficient evidence that the actions of Hebert were severe or pervasive. Even assuming that Hebert brushed against plaintiff and made a sexually suggestive remark on one occasion, that he locked up some furniture that she wanted, that he opened a door quickly as she approached after a fire drill, and that he used obscenities in her presence, the actions were simply neither severe nor pervasive enough to submit to a jury. Because the conduct here was not frequent or severe, was not physically threatening or humiliating, and did not unreasonably interfere with plaintiff's work performance, no rational trier of fact could find that plaintiff was subjected to a hostile work environment.

## 2. The Liability of the Employer for Conduct of a Co–Worker

■ Even if plaintiff could establish that she was subjected to a hostile work environment, she cannot prevail as a matter of law because she cannot establish the fifth element of her prima facie case, that the Board is liable. This is an independent requirement. The Sixth Circuit has recently held that, in light of the Supreme Court's holdings in *Burlington*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633, and *Faragher*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662, the standard for evaluating employer liability for a hostile work environment differs based on the relationship between the perpetrator and the victim. *See Williams*, 187 F.3d 553. If the perpetrator of the harassment is in a supervisory capacity vis-a-vis the victim, the employer is derivatively, or vicariously, liable for the harassment. *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir.1997); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir.1994). Employer liability in cases of co-worker harassment is direct, rather than derivative. The employer is liable only if its "response manifests indifference or unreasonableness...." *Blankenship*, 123 F.3d at 873 (citing *Pierce*, 40 F.3d at 803–04).

In the present case, Hebert was not in a supervisory role over plaintiff; Hebert was, at most, her co-worker. Thus, to prevail on a claim against the Board for Hebert's actions in this case, the plaintiff must not only establish the four elements discussed above, but she must also show that the Board "knew or should have known of the charged sexual [or racial] harassment *and* failed to implement prompt and appropriate corrective action." *Blankenship*, 123 F.3d at 872 (quoting *Rabidue*, 805 F.2d at 621 (6th Cir.1986)) (emphasis added).

■ The crucial issue, then, is whether the Board responded appropriately to facts that it knew or should have known. It is undisputed that the plaintiff did not notify any school administrator of the one sexually suggestive remark by Hebert. In addition, the plaintiff has introduced no evidence that she *ever* made any complaints specifically about sexual harassment by Hebert. Instead, plaintiff made only veiled complaints insinuating that Hebert was disrespectful toward her because she was a woman. For example, in her Sep-

---

**14.** There is no proof of the number of days she was absent.

tember 7, 1995 letter complaining about the "bathroom incident," she notes "I am a female that has to work around and with someone who has no respect for me." (Brooks Dep. Exh. 1 and 2.) This statement is hardly the kind of complaint that would put defendant on notice that plaintiff believed there was a hostile work environment *based on her gender.*

Given the sparse knowledge that the Board had, however, it took great pains to provide prompt and appropriate remedial action. When plaintiff complained in 1993 or 1994 to the then principal about Hebert's use of "you people," Howard provided plaintiff with authorization to come directly to the principal if Hebert offended her with his comments. Plaintiff took advantage of this offer after her interactions with Hebert in 1995 by approaching the new principal, Dr. Brooks. After plaintiff made her first complaint to Dr. Brooks about Hebert's cursing and perceived threatening behavior during the "bathroom incident," Dr. Brooks immediately called a meeting with all parties, chastised Hebert, issued a formal letter of reprimand, and sent a copy of the reprimand to the personnel office. Indeed, plaintiff concedes that defendant's actions were prompt, at least with respect to the "bathroom incident" of September 7. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 11.) When plaintiff became upset at Hebert's decision to laminate and post the reprimand, Dr. Brooks instructed Hebert to take it down, which Hebert immediately did. When plaintiff complained that Hebert had forcibly opened a door on her during the "fire drill incident," Dr. Brooks instituted an investigation, even though Hebert had already taken an extended leave of absence by the time Dr. Brooks received the complaint. When plaintiff became distraught at her inability to use the phone in Hebert's office, the school administration had a private phone line installed in her classroom. When plaintiff complained that she had seen Hebert at the school after he had taken a leave, Dr. Brooks ordered Hebert to turn in his keys. Dr. Brooks took reasonable steps to en-

sure that the plaintiff would have a non-hostile working environment. All of these actions by Dr. Brooks on behalf of the Board were appropriate based on the nature of the conduct the Board was aware of at the time and constitute "good-faith remedial action," not "such indifference as to indicate an attitude of permissiveness that amounts to discrimination." *Blankenship,* 123 F.3d at 873. Therefore, even assuming, arguendo, that Hebert's actions would otherwise have created a hostile work environment, no reasonable trier of fact could find the Board liable for Hebert's actions here in light of its prompt, remedial actions.

Plaintiff claims, however, that a genuine issue of fact exists as to whether the Board should have taken "more effective measures." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 14.) She asserts that Hebert's lamination of his reprimand, combined with the absence of any disciplinary action against him following the October 26 letters from Wilmah Foster and S.P. Williams, establishes that the remedial action was not effective. Plaintiff further relies on her inability to use the telephone and coffee pot in Hebert's office for several months as evidence that the remedial action was inappropriate. As an appropriate measure after the bathroom incident and the posting of the reprimand, plaintiff believes the Board should have relocated Hebert's office to another part of the school. Nevertheless, plaintiff's proof indicates that there was no other space for Hebert to occupy. The office to which he was later assigned was under construction in the fall of 1995. (Turner Dep. at 33.)

Sixth Circuit law is clear that "a harassment victim may not dictate an employer's action against a co-worker." *Blankenship,* 123 F.3d at 874 (citing *Bell v. Chesapeake & Ohio Ry.,* 929 F.2d 220 (6th Cir.1991)). In *Bell,* a case involving extremely serious racial discrimination, an African–American employee complained that co-workers had erected Ku Klux Klan recruiting posters. The employer took the posters down.

Finding this remedial action was sufficient, the Sixth Circuit held that a plaintiff will not prevail simply because the remedy offered by defendant was not what plaintiff wanted. *Bell,* 929 F.2d at 225. In light of this decision, Dr. Brooks' actions in the present case were not unreasonable.

■ In a co-worker harassment case, a defendant may not be held liable for discrimination based on negligence in fashioning a remedy. *Id.* at 873. Even if "hindsight show[ed] that these measures [might] not have been sufficient, they were appropriate at the time and easily satisfy the 'good faith' standard." *Blankenship,* 123 F.3d at 874 (citing *Mullholand v. Harris Corp.,* 72 F.3d 130, 1995 WL 730466, at *3 (6th Cir.1995)). Thus, even if the Board could have taken more effective measures, all that the Board was required to take was good faith, remedial action. Here, the jury could not reasonably find that the Board's actions were not in good faith and appropriate.

### CONCLUSION

For the foregoing reasons, the Board's motion for summary judgment is granted and plaintiff's claims against the Board are dismissed with prejudice.

IT IS SO ORDERED.