603 F.Supp. 1457 (1985)
Daisy HARRISON, Plaintiff,
v.
REED RUBBER COMPANY, Defendant.
No. 83-0922C(3).
United States District Court, E.D. Missouri, E.D.
January 10, 1985.
As Amended April 22, 1985.
*1458 Clyde E. Craig and Nancy M. Watkins, Wiley, Craig, Armbruster, Wilburn & Mills, St. Louis, Mo., for plaintiff.
Amy S. Rubin, St. Louis, Mo., for defendant.

MEMORANDUM
HUNGATE, District Judge.
Plaintiff, a former employee of defendant, contends in this lawsuit that she was sexually harassed by her supervisor, Roy Nolkemper, while employed by defendant, and that her complaints of the harassment were not effectively resolved. Plaintiff was eventually demoted from her position as foreman of the company's hydraulic hose line, and she claims that the demotion resulted from sexual discrimination on defendant's part. Plaintiff sues under Title VII, 42 U.S.C. § 2000e, et seq.
Plaintiff's claims were tried to the Court on September 4, 5, and 6, 1984. Both parties have filed proposed findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff, a female citizen of the United States and a resident of the State of Missouri, was employed by defendant from March 19, 1979, through August 23, 1983.
2. Defendant, a Missouri corporation, is an employer engaged in an industry affecting interstate commerce. Defendant has had more than fifteen employees for each working day in each of twenty or more calendar weeks in the current and preceding years within the meaning of 42 U.S.C. § 2000e(b).
3. Plaintiff filed a complaint of sexual harassment against defendant with the Equal Employment Opportunity Commission (EEOC) on April 15, 1982. She received a notice of her right to sue on February 14, 1983, and this action was brought within ninety days of the notice.
4. Defendant manufactures and distributes rubber products for industrial use. There are various departments within the company, including hydraulic hose production, *1459 vulcanizing, warehousing, and sales. The president, William Reed, has been employed by defendant since 1935. The president's brother, Nelson Reed, is vice-president. Ray Nolkemper has been employed by defendant in various capacities for more than twenty years.
5. Shortly after plaintiff began her employment with defendant, she was assigned to work on the hydraulic hose line. In March of 1981, not long after Nolkemper became plant superintendent, plaintiff began training to become foreman of the hose line. She was recommended for the position by Nolkemper and assumed the position of foreman during the summer of 1981 after receiving the approval of William Reed.
6. About the time plaintiff became foreman, Nolkemper began demonstrating a personal interest in her. He frequently asked her about her home life, suggested that he date her and that she divorce her husband, stated that he would adopt her children and provide her a home, and told her that sex need not be involved immediately. He also initiated physical contact, such as placing his hand on hers, putting his arm around her, or tucking her stray tag into her blouse. Nolkemper placed himself unnecessarily close to plaintiff and remained in plaintiff's work area more frequently than necessary. He also repeatedly called her away from the line, both for work-related and personal reasons.
7. Plaintiff did not seek or enjoy Nolkemper's attentions, and she repeatedly asked him to stop. Nolkemper persisted in his behavior nonetheless. Sometime in the fall of 1981, plaintiff approached William Reed to complain about Nolkemper. She testified that she did not wish to have Nolkemper fired, and the Court finds that plaintiff failed to communicate clearly the nature of her problem with Nolkemper. Instead, plaintiff informed William Reed, in Nelson Reed's presence, that Nolkemper was spending too much time in the hose area and infringing on plaintiff's function as foreman. Plaintiff expressed her appreciation of Nolkemper's assistance but stated that she could perform the work satisfactorily without him.
8. Immediately upon the plaintiff's complaint, William Reed instructed Nolkemper that plaintiff should be able to perform her job without his close monitoring, and that such monitoring was not a good use of Nolkemper's time. When Nolkemper stated that plaintiff still needed assistance, William Reed suggested she might not be the right person for the job.
9. After William Reed talked to him, Nolkemper stayed away from plaintiff for several days but eventually began bothering her again.
10. On October 25, 1981, plaintiff and her sister accompanied Nolkemper to lunch in honor of his birthday. Plaintiff testified that she did not pay for Nolkemper's lunch.
11. By 1982, Nolkemper's persistent efforts to engage plaintiff's affection were obvious to other people at the plant. Nolkemper became possessive and sought to avoid letting plaintiff speak with other men. Upon Nolkemper's approach to plaintiff, plaintiff's co-workers would make such remarks as, "Here comes your boyfriend." Plaintiff avoided him when possible and told him to leave her alone.
12. In February of 1982, plaintiff asked for and was appointed an assistant foreman. This position was created at plaintiff's request. Plaintiff also complained again to William Reed about Nolkemper's constant presence and suggested Nolkemper's personal interest in her. The Court does not credit William Reed's testimony that he was unaware of the nature of plaintiff's problem with Nolkemper at this time, particularly in light of the relatively small size of the plant, the admitted openness of Nolkemper's "affection," and the general knowledge at the plant of his feelings about the plaintiff.
13. In response to plaintiff's complaint, William Reed instructed Nolkemper that Nolkemper was not to be in plaintiff's work area for more than ten minutes in the morning and ten minutes in the afternoon. Nolkemper did not comply with this directive *1460 but instead continued to spend large amounts of time in plaintiff's work area and to communicate his personal feelings to the plaintiff. Nolkemper told William Reed that more than ten minutes was needed in order to supervise plaintiff.
14. William Reed was out of town during the week of March 22, 1982. On March 23, 1982, plaintiff advised Nelson Reed of Nolkemper's personal interest in her. Nelson Reed was already aware that Nolkemper spent too much time in plaintiff's work area, and he told the plaintiff he would take action. That same day, he spoke to Nolkemper who admitted that there was something to the plaintiff's charges. Nolkemper was then relieved of his duties as plant superintendent and reinstated to the clerking position from which he had been promoted the previous year. He suffered no loss in wages or fringe benefits, and no one was appointed to replace him. He was, however, advised to stay out of the warehouse when plaintiff was in there.
15. Plaintiff worked her normal hours that week, although she asked for and was refused time off for the end of the week. Plaintiff did not come to work on Monday or Tuesday of the following week due to illness.
16. William Reed returned to the plant on March 29, 1982, and was advised by Nelson Reed of the previous week's events. William Reed discovered that a large order for which the plaintiff was responsible had not yet been filled and found the scrap bin to be quite full from previous errors, including the duplication of various items. In plaintiff's absence, he instructed Nolkemper to return to the warehouse to complete the order. Nolkemper then reiterated that it had been necessary to supervise plaintiff closely.
17. Plaintiff had not received any complaints about her work prior to that time. Nonetheless, when she returned to work on March 31, 1982, William Reed called her in to his office and said that she was being relieved of her supervisory duties due to the large number of errors and scraps. This demotion entailed a 50¢ per hour decrease in wages; however, plaintiff was offered the position of assistant foreman, which she refused, at a decrease of only 25¢ per hour. Plaintiff later accepted the position of assistant foreman, after having filed her complaint with the EEOC.
18. Although Nolkemper made no sexual advances to plaintiff after March of 1982, he continued to have contact with her. He telephoned the plaintiff at her mother's home in an effort to resolve their differences, and he gave her a note at work saying he was her best friend. Nolkemper also continued to tell the plaintiff that he loved her.
19. In an effort to avoid Nolkemper, in November of 1982 plaintiff asked for and was given a transfer to the night shift in the vulcanizing department at 15¢ per hour less than she was making. Nolkemper occasionally stood in the doorway and observed plaintiff work, but did not approach her. Plaintiff did not complain of this behavior to the Reeds, nor did they ever inquire of her whether Nolkemper was leaving her alone.
20. In February of 1983, plaintiff's attorney advised defendant's attorney that Nolkemper was continuing to subject plaintiff to unwelcome advances and requested that the advances be stopped. Defendant's attorney investigated the report and determined that any incidents between plaintiff and Nolkemper were isolated and not continuing. The company took no action against Nolkemper, who remained employed by defendant at the time of trial.
21. In April of 1983, plaintiff became ill and was hospitalized for her depression. She resigned her position in August of 1983, citing the allegedly discriminatory condition of her employment as the reason for leaving.
22. Neither William nor Nelson Reed ever told plaintiff that she would be demoted or discharged if she did not allow Nolkemper to touch her, date her, or proposition her.

*1461 Conclusions of Law

1. The Court has jurisdiction of this case under 42 U.S.C. § 2000e, et seq.
2. In Bundy v. Jackson, 641 F.2d 934 (D.C.Cir.1981), the Court held that sexual harassment amounts to discrimination regarding the terms or conditions of employment when an employer creates or condones a substantially discriminatory work environment, even if no tangible job benefits are lost thereby. This principle has been cited with approval by the Eighth Circuit, in regard to allegations of racial discrimination. Taylor v. Jones, 653 F.2d 1193, 1199 (8th Cir.1981) (Court cited Bundy in support of the proposition that Title VII is violated by employer's toleration of a racially discriminatory work atmosphere).
3. In order to prove such a claim, a two-step analysis is appropriate:
First, the plaintiff must make a prima facie showing that sexually harassing actions took place, and if this is done, the employer may rebut the showing either directly, by proving that the events did not take place, or indirectly, by showing that they were isolated or genuinely trivial. Second, the plaintiff must show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation. This showing can also be rebutted by the employer directly, or by pointing to prompt remedial action reasonably calculated to end the harassment.
Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983).[1] In offensive environment cases, courts should use normal principles of pleading and proof allocation. Henson v. City of Dundee, 682 F.2d 897, 905 n. 11 (11th Cir.1982).
4. It is virtually uncontested that plaintiff has established that sexually harassing actions took place from the summer of 1981 through plaintiff's resignation in 1983. The Court has further determined that plaintiff's employer knew or should have known of the harassment by early 1982. The question whether defendant took effectual action to correct the situation is more difficult. Plaintiff does not dispute that after her complaints, Nolkemper stayed away from her for days at a time. However, the harassment never finally ceased, and the Court finds that defendant's actions were not sufficiently effectual to preclude liability for Nolkemper's actions. Although the Reeds instructed Nolkemper to stay away from plaintiff, their instructions were apparently based on productivity considerations and did not include directives to cease all sexual harassment. Nor did the Reeds monitor Nolkemper's behavior to ascertain whether all harassment ceased. Consequently, plaintiff was eventually forced to switch departments in an effort to avoid Nolkemper, at a monetary loss to herself. Thus, defendant has failed to rebut plaintiff's evidence proving an offensive work environment in violation of Title VII.
5. The Court now addresses plaintiff's claim of retaliatory demotion in March of 1982, when she was relieved of her supervisory duties shortly after again complaining about Nolkemper. In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-26, 36 L.Ed.2d 668 (1973), the Supreme Court established that, to prove an employment discrimination case under Title VII, the burden of proof is as follows: first, the employee must make out a prima facie case, then the employer must be given the opportunity to articulate legitimate, nondiscriminatory reasons for its actions, and finally, the plaintiff is given an opportunity to show that the purported legitimate reason was pretextual.
*1462 6. In Bundy v. Jackson, supra, this analysis was modified in situations where, as here, an employee has already proved that she was "a victim of illegal discrimination as a matter wholly independent of her claim for back pay and promotion." Id. at 952. In such cases, the Court noted that once a prima facie case is established, "the employer then must bear the burden of showing, by clear and convincing evidence, that he had legitimate and nondiscriminatory reasons for [his action]," id. at 953, after which a plaintiff must then show pretextuality. Discriminatory actions by the defendant having already been proved, uncertainty as to the motive underlying plaintiff's demotion should be resolved against the defendant-employer.
7. The Court finds that plaintiff established a prima facie case of illegal demotion in retaliation for plaintiff's complaints about Nolkemper by showing that she was a victim of a pattern of sexual harassment attributable to her employer, and that she was demoted from a position from which she was satisfactorily performing and of which she had a reasonable explanation. Plaintiff had performed as foreman for almost a year prior to her demotion, and the Court credits plaintiff's testimony that the hydraulic hose line ran smoothly and she received no complaints about her performance until the date of her demotion.
8. The Court finds that defendant failed to show, by clear and convincing evidence, legitimate, nondiscriminatory reasons for demoting plaintiff. Defendant presented credible evidence suggesting that one order for which plaintiff was responsible was poorly handled. Absent a showing that immediate demotion for a single error was ordinary in defendant's plant, it is not clear that plaintiff's complaints about her supervisor, a twenty-year employee with the company, were not in part responsible for her demotion. This is particularly true in light of William Reed's insistence that he was first aware of the harassment just days before he relieved the plaintiff of her position as foreman, yet demoted her without considering the possible effect of the harassment on her performance.
9. In computing plaintiff's damages, the Court rejects plaintiff's contention that defendant is liable for the full 50¢-per-hour loss suffered upon her demotion, since plaintiff was offered but refused the position of assistant foreman at only 25¢ per hour less. The Court calculates plaintiff's loss at $291.90 for the period from March 31 through November 22, 1982, based on defendant's employee data calendar for plaintiff, indicating 1167.6 hours worked or paid leave. Since plaintiff is no longer employed by defendant, the Court need not consider plaintiff's request for reinstatement to the foreman position.
10. When plaintiff began working the night shift in the vulcanizing department, she lost an additional 15¢ per hour. Although she lost an additional 10¢ per hour when she returned to the day shift, the date of her return was not sufficiently established to award additional damages. The Court finds that plaintiff worked 683.4 hours before her resignation, amounting to a $273.36 loss in wages.
11. Plaintiff is the prevailing party and is therefore entitled to attorney's fees.

JUDGMENT
Findings of fact and conclusions of law dated this day are hereby incorporated into and made a part of this judgment.
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment be and the same is entered in plaintiff's favor and against defendant in the amount of $565.26, with costs and attorney's fees assessed against defendant.
IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that plaintiff shall file a documented request for attorney's fees within ten days of the date of this judgment.
IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that defendant *1463 shall respond within ten days thereof to plaintiff's request for fees.
NOTES
[1] The Eleventh Circuit has developed a more detailed, five-step analysis. In that circuit, a plaintiff must show that she belongs to a protected group, that she was subject to unwelcome sexual harassment, that the harassment was based upon sex, that the harassment affected a term or condition of employment, and that the employer knew or should have known of the harassment and failed to take prompt remedial action. Henson v. City of Dundee, 682 F.2d 897, 903-05 (11th Cir.1982). Essentially, the first four elements of this test merely clarify the first step referred to in Katz.