72 F.3d 130
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Marlene MULLHOLAND, Plaintiff-Appellant,
v.
HARRIS CORPORATION, Defendant-Appellee.
 No. 94-3725.
 United States Court of Appeals, Sixth Circuit.
 Dec. 8, 1995.
 
 Before: BROWN, BOGGS, and NORRIS, Circuit Judges.
 PER CURIAM:
 
 
 1
 Marlene Mullholand appeals from a grant of summary judgment to Harris Corporation ("Harris") on her claims of sexual harassment (hostile workplace environment) under 42 U.S.C. Sec. 2000e and intentional infliction of emotional distress under Ohio law. We affirm.
 
 
 2
 * Mullholand, a white female, was employed by Harris as an assembler in its Findlay, Ohio plant. Harris also employed Robert Young, a black male, and Ken Paul. Mullholand was assigned to assist in Young's on-the-job training.
 
 
 3
 Mullholand claims Young came to her trailer and propositioned her. He reportedly asked her if she ever thought about having sex with a black man. Mullholand states that she refused and forced Young to leave. Mullholand implies that as a result of being sexually rebuffed, Young began to spread rumors that he and Mullholand had had sex together.
 
 
 4
 Mullholand represents that the following eight episodes, stemming from Young's rejection, occurred while on the job at Harris. First, Mullholand complained about Young's alleged rumor-mongering to her foreman, Robert Wright. Wright and Mullholand then confronted Young, who denied that he was spreading rumors about sleeping with Mullholand. Wright told Mullholand to let him know if the rumors continued. Mullholand then began to avoid working overtime after her normal hours on the second shift were complete, so as not to come in contact with Young, who worked on the third shift.
 
 
 5
 Second, approximately one week later, Mullholand again complained to Wright that Young was continuing to spread rumors, as well as staring and laughing at her in the halls. Joseph Wagner, Young's foreman, talked to Young as a result, and again Young denied Mullholand's accusations. Wagner asked how Mullholand was doing a number of times after that.
 
 
 6
 Third, Mullholand then began to work on the first shift and, after a change in foreman, Young allegedly began spreading rumors again. Mullholand reported this to the new foreman, Michael Wiljamaa. Wiljamaa reportedly told Mullholand that this was just gossip, "What can you do?"
 
 
 7
 Fourth, Mullholand complained to Wiljamaa that Young had pushed her against her locker and slammed its doors against her. Wiljamaa then spoke to Young, who again denied both the locker incident and spreading rumors about Mullholand. Wiljamaa told Mullholand that he could not do anything about Young's alleged behavior unless Mullholand had witnesses.
 
 
 8
 Fifth, Mullholand again complained about a new, identical locker incident. Wiljamaa again asked Mullholand whether there were any witnesses. Mullholand admitted there were not.
 
 
 9
 Sixth, Mullholand complained to Wiljamaa about Ken Paul, who Mullholand alleged was calling her a "bitch" because of the accusations she was bringing against his friend, Young. Wiljamaa instructed Paul to apologize, but apparently Paul did not, as Mullholand alleges he came to see her throughout the day, and taunted her by telling her he would not apologize. Mullholand called Thomas Urban at Harris's Employee Relations department to complain. Urban paged Wiljamaa and told him to handle the situation. Wiljamaa then chastised Mullholand for going over his head.
 
 
 10
 Seventh, Mullholand was standing at the company time clock talking with Ramona Berry and Phyllis Smith, with Brenda Smith behind them, when Young, who was seated 20 to 30 feet away, saw them and yelled, "What are you staring at?" Mullholand and one of the other women replied, "What are you staring at?" Young then slid out of his chair and told Mullholand he had been waiting for "this" for a long time. Young allegedly grabbed Mullholand by her arms with one of his own arms and used his other arm to slap her across the left side of her face with his palm. (Apparently neither Berry nor the Smiths gave depositions in the case, or at least these are not cited or included in the record on appeal.) Mullholand went to the office of Wayne Mertz, who handles plant security matters, and Mertz instructed Mullholand to write down everything that had occurred. Mertz took Mullholand to the office of Timothy Jackson, a Harris human resources officer, who discussed the "time clock incident" with her, took the names of the witnesses and told Mullholand that he would get back to her later that day.
 
 
 11
 Jackson states that he spoke to the witnesses and, although they confirmed that Young had slapped Mullholand, they also indicated that Mullholand and Young were pointing fingers at each other before Young slapped Mullholand. Young's version of events is that Mullholand first pointed a finger at his throat, which he slapped away, unintentionally hitting her face. Jackson says he saw no visible signs on Mullholand that she had been slapped.
 
 
 12
 The Monday immediately following this "time clock incident," Mullholand went to a meeting with various representatives of the company and her union. The company and the union had jointly agreed to a suspensions of Mullholand for 5 days and Young for 10 days, acting on Jackson's finding that both Young and Mullholand bore partial responsibility for the altercation.
 
 
 13
 Finally, Mullholand pressed criminal charges for assault against Young, and the court date was set on April 17. Mullholand reported to Harris plant manager John Mainser that Ken Paul had told her, "You're going to burn in hell, bitch!" and that she would "really cry on the 17th." Mainser said he would look into it, but never got back to Mullholand, although Mullholand was aware that someone at the company had questioned Paul about the alleged incident. (The result of the criminal action is not given in the record.)
 
 
 14
 After receiving a right to sue letter from the Ohio EEOC, Mullholand filed a complaint in the United States District Court for the Northern District of Ohio against a number of defendants, on a variety of legal theories. For the purposes of the current appeal, only Mullholand's claim for sexual harassment (hostile workplace environment) and a pendent Ohio state law claim for intentional infliction of emotional distress are relevant. Many of the original defendants have been dismissed from the action, and Mullholand's brief makes clear that she is appealing only the court's grant of summary judgment.
 
 
 15
 The Sixth Circuit reviews a grant of summary judgment de novo. Baggs v. Eagle-Picher Indus., Inc., 957 F.2d 268, 271 (6th Cir.), cert. denied, 113 S.Ct. 466 (1992). We must affirm only if we determine that the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When evaluating an appeal, we must view the evidence in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
 
 II. RESPONDEAT SUPERIOR LIABILITY
 
 16
 Mullholand's claim of sexual harassment is grounded in a claim that her employer tolerated a hostile workplace environment. The prima facie elements of such a claim when the alleged harassment stems from co-workers are: (1) that Mullholand is a member of a protected class; (2) that Mullholand was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) that the harassment was based upon sex; (4) that harassment had the effect of unreasonably interfering with Mullholand's work performance and created an intimidating, hostile, and offense working environment; (5) Mullholand can prove respondeat superior liability on the part of Harris. Rabidue v. Osceola Ref. Co., 805 F.2d 611, 619-20 (6th Cir.1986), cert. denied, 481 U.S. 1041 (1987). Here, we need address only the last element, respondeat superior liability, because this is the basis on which the district court granted summary judgment against Mullholand, and we agree with the district court that Mullholand has not pled facts sufficient to satisfy this element.
 
 
 17
 It is Mullholand's burden to demonstrate respondeat superior liability. Mullholand must prove that Harris, "through its agents or supervisory personnel, knew or should have known of the sexual harassment and failed to implement prompt and appropriate corrective action." Id. at 621. Here, even if we assume that each of the eight incidents set forth above were sexual harassment, and that knowledge of Mullholand's allegations can be ascribed to Harris, Mullholand has failed to carry her burden. In each case, the response of Harris or its employees to Mullholand's allegations was prompt and appropriate corrective action under the circumstances.
 
 
 18
 We consider each of the eight incidents in turn. First, Wright's response to Mullholand's allegations of rumor-mongering were appropriate. Given that this was the first complaint Mullholand had made, it would hardly have been sensible to take serious action without investigation at this time. People gossip at work, and unfortunately this gossip is sometimes false. Wright's response of going with Mullholand to confront Young, and when Young denied the rumors, simply telling Mullholand that she should inform him if the rumors persisted is entirely reasonable. The second rumor-spreading incident was similar. Wagner acted reasonably in talking to Young and checking up on Mullholand. Wiljamaa's response, after Mullholand's third complaint about rumor-mongering, was to encourage Mullholand to have a thicker skin--perhaps not the response that Mullholand would have preferred, but Mullholand has no right to the response that she would have taken if she had been a supervisor at Harris. Bell v. Chesapeake & Ohio Ry. Co., 929 F.2d 220, 225 (6th Cir.1991) (per curiam). In Bell, an African American plaintiff made much more serious allegations of racial discrimination--he claimed that it was an deficient response for his employers simply to remove Ku Klux Klan (KKK) recruiting posters he found on company bulletin boards and his locker. Bell held the employer's less-than-perfect response to these incidents did not give rise to respondeat superior liability. The response of Harris's agent, Wiljamaa, to the allegations of gossip in this case was not unreasonable in light of Bell.
 
 
 19
 The fourth and fifth incidents, involving Young allegedly slamming Mullholand with locker doors, were treated more seriously by Wiljamaa. Wiljamaa spoke to Young, and in light of Young's denials, it was perhaps practical advice for Wiljamaa to tell Mullholand that no serious action could be taken unless Mullholand had witnesses. Under Title VII, victims of sexual discrimination bear the burden of proof. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1980). If this is the standard in the law, it can hardly be a violation of its legal duty for an employer to act on that same standard in its private regulation of employee conduct toward other employees.
 
 
 20
 Wiljamaa told Paul to apologize for calling Mullholand a "bitch." The record is devoid of evidence of whether Paul actually did apologize, but it is clear that Wiljamaa disciplined Paul in this fashion on the basis of Mullholand's word alone. Mullholand now finds this action insufficient. But there is no evidence that Mullholand objected at the time to the sanction the company chose to impose. The company's response was not inappropriate corrective action. If Mullholand cannot establish respondeat superior liability when Harris took no action in response to an allegation supported by Mullholand's word alone, then it is clear that Mullholand has not established respondeat superior liability when Harris took action on that same basis. Given that Wiljamaa went the "extra mile" for Mullholand, telling Paul to apologize on the basis of Mullholand's word alone, it was not unreasonable for him to have reprimanded Mullholand for going over his head to Urban in Harris's Employee Relations department. Nor did Urban act inappropriately when he referred Mullholand's complaint to Wiljamaa. Wiljamaa was Mullholand's immediate supervisor, and it was permissible for the company to allow Wiljamaa to attempt to correct the situation initially.
 
 
 21
 Harris's response to the "time clock incident" was also not inappropriate. Harris launched an investigation, because Mullholand had witnesses to the altercation. Harris's investigation, conducted by Jackson, revealed evidence from which it was not unreasonable for Harris to conclude that Mullholand was not simply a passive victim of Young, however. Therefore, Harris did not act inappropriately in disciplining both Mullholand and Young. In Bell, the plaintiff and a co-worker were both disciplined for fighting by their employer, when the co-worker allegedly yelled to the plaintiff in the company lunch room, "I hope the KKK kills all the niggers!" Bell held that this response by the plaintiff's employer was insufficient to give rise to respondeat superior liability. Bell, 929 F.2d at 225. Moreover, here, Mullholand's union, which has an incentive to promote her best interests, agreed that the discipline Mullholand received was not grievable based on the facts as they appeared to the union.
 
 
 22
 The eighth incident, involving Paul again taunting Mullholand with the word "bitch," and his veiled threats against Mullholand for pressing criminal charges of assault against Young were no different than Mullholand's earlier rumor-spreading charges against Young, and name-calling charge against Paul. Harris again responded by questioning Paul, though there is no evidence in the record of the result of this investigation.
 
 
 23
 Whether singly or in combination, Mullholand's accusations cannot survive summary judgment, because of failure to support respondeat superior liability, as shown by the discussion in Bell:
 
 
 24
 Erebia v. Chrysler Plastic Products Corp., 772 F.2d 1250 (6th Cir.1985), cert. denied, 474 U.S. 1014 ... (1986), in which we found an employer liable for racial harassment by its employees, and Batts v. NLT Corp., 844 F.2d 331 (6th Cir.1988), where we came to the opposite conclusion, provide a matrix for evaluating Bell's assertion that CSX's response was inadequate. In Erebia, the degree of racial hostility exhibited toward the plaintiff was repeated and extreme.... Racial slurs occurred regularly over a five-year period. Plaintiff reported the situation to three different managers, who did nothing or insulted or threatened the plaintiff. In Batts, however, the plaintiff complained of such acts as 1) being required to change light bulbs when white employees in his job category were not required to do so; 2) not being given a more desirable work assignment until he requested it; 3) the failure of a white employee to follow his instructions after he was promoted to a supervisory position; 4) the posting, on the company's bulletin board by anonymous persons, of an article reporting an anti-discrimination suit the plaintiff had filed; and 5) finally, jokes by a supervisor at a company function about plaintiff's putative propensity to file anti-discrimination suits.
 
 
 25
 Bell, 929 F.2d at 224. Along this continuum, the eight Mullholand incidents are probably more serious than those in Batts, but they fall short of those in Bell, and so certainly fall short of those in Erebia.
 
 
 26
 Mullholand cites no cases from the Sixth Circuit to support her argument that Harris responded inappropriately to the eight incidents. Moreover, the cases she does cite are inapposite. In Katz v. Dole, 709 F.2d 251 (4th Cir.1983), Federal Aviation Administration's supervisory personnel did nothing, despite actual knowledge that a woman was being sexually harassed, and that other supervisors in fact took part in the harassment. The fact that the supervisory personnel took part in the harassment instantly distinguishes Katz from Mullholand's case, however, as does the employer's failure to take any action. Delgado v. Lehman, 665 F.Supp. 460 (E.D.Va.1987) is similar--a navy supervisor consistently harassed female subordinates. Also, in Delgado, the head of the EEO office discouraged women from making complaints. There is no allegation by Mullholand that Harris discouraged her complaints, except the relatively minor incident in which Wiljamaa became perturbed that Mullholand went over his head. Harrison v. Reed Rubber Co., 603 F.Supp. 1457 (E.D.Mo.1985), also involves harassment by a supervisor, as does Heelan v. Johns-Manville Corp., 451 F.Supp. 1382 (D.Colo.1978). Each case Mullholand cites is useless to her cause, because they do not address respondeat superior liability, which is the crucial issue when an allegation of sexual harassment is based on the conduct of co-workers.
 
 
 27
 The district court did not improperly grant summary judgment on the issue of hostile workplace sexual harassment against Mullholand, because there was no genuine issue of material fact that Mullholand had failed to plead facts sufficient to support a prima facie showing of respondeat superior liability.
 
 
 28
 III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
 
 
 29
 The district court did not err in granting summary judgment against Mullholand on the Ohio state law issue of intentional infliction of emotional distress. It is clear that Harris's supervisors did not harass Mullholand. The only viable allegation Mullholand can make is that Young and Paul harassed her. Thus, Mullholand faces the same respondeat superior stumbling block here she faces to her sexual harassment claim. Ohio law holds that there can be no respondeat superior liability for acts done outside the scope of employment. Byrd v. Faber, 565 N.E.2d 584, 587-88 (Ohio 1991). Byrd held that a church could not be held liable for, among other things, fraud and intentional infliction of emotional distress, on a respondeat superior theory, for nonconsensual sexual relations between a pastor and a parishioner, because the "Seventh-Day Adventist organization in no way promotes or advocates nonconsensual sexual conduct between pastors and parishioners." Id. at 588. Similarly, there is no evidence in the record that Harris promoted or advocated the alleged behavior of Young and Paul. Thus, Harris cannot be held liable for an intentional infliction of emotional distress claim by one of its employees.
 
 
 30
 Byrd's validity may have been affected by Kerans v. Porter Paint Co., 575 N.E.2d 428, 493 (Ohio 1991), however, which holds that an employer "may be independently liable for failing to take corrective action against an employee who poses a threat of harm to fellow employees...." This court need not take a position on the possible conflict between Byrd and Kerans, however, because Mullholand can satisfy neither Byrd nor Kerans. The standard that Kerans imposes on employers is based on negligence, and can be roughly identified with the Sixth's Circuit's requirement in federal hostile workplace environment cases of a failure to take appropriate corrective action in response to harassment by co-workers, before an employer will be held liable on a respondeat superior theory. Here, Mullholand cannot show, as a threshold matter, that Harris was negligent in failing to take appropriate corrective action to remedy the eight incidents. Therefore, she cannot maintain a suit in tort for intentional infliction of emotional distress against Harris under Kerans. The district court did not rely on Byrd or Kerans, but this court's de novo standard of review permits it to take an independent look at Ohio law.
 
 
 31
 Moreover, the district court was correct in concluding that the "outrageous and extreme" level that Harris's behavior would have to rise to here, in order to constitute an intentional infliction of emotional distress under Ohio law, has not been met.
 
 
 32
 Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
 
 
 33
 Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Amer., 453 N.E.2d 666, 671 (Ohio 1983) (quoting Restatement (Second) of Torts Sec. 46). The conduct of the workers alleged here, while unseemly, is not so uncivilized to rise to this level. The company's actions are far less culpable, if culpable at all.[1] Not every successful allegation of sexual harassment rises to this level, and Mullholand cannot prove even sexual harassment on the part of Harris. Baab v. AMR Servs. Corp., 811 F.Supp. 1246, 1270 (N.D.Ohio 1993). Hence, the district court did not err in granting summary judgment to Harris.
 
 IV
 
 34
 The district court's grant of summary judgment in favor of Harris is AFFIRMED.
 
 
 
 [1]
 For a viable example of conduct which is sufficiently outrageous to be actionable under the Restatement, see Pratt v. Brown Machine Co., 855 F.2d 1225, 1238-42 (6th Cir.1988) (intentional infliction of emotional distress under Michigan adoption of the Restatement for employer to coerce employee into silence in the face of 18 months of harassing phone calls, some threatening rape, put to the employee's wife by an upper level manager of the employer). In Kramer v. Price, 712 F.2d 174, 175-76 (5th Cir.1983), vacated and reh'g granted, 716 F.2d 284 (5th Cir.1983), on reh'g, 723 F.2d 1164 (5th Cir.1984) (per curiam) (en banc), a jilted lover of a newly-wed husband mailed the following postcard to the husband's wife shortly after she had delivered the couple's baby:
 Baby Problem Solved!
 --with this beautiful
 ALL METAL
 CASKET-VAULT COMBINATION
 CRYPT a CRIB....
 Id. at 175. Kramer dealt with a criminal statute, not a tort, but it helps to illustrate the level to which uncivilized behavior that distresses another must rise to in order to constitute the intentional infliction of emotional distress tort.