HEIGHTS DRIVING SCHOOL, INC., John Cox, and Daniel Cox, Plaintiffs–Appellants, Cross–Appellees,

v.

TOP DRIVER, INC., and TD Heights Acquisition, Inc., Defendants–Appellees, Cross–Appellants.

Nos. 01–3031, 01–3153.

United States Court of Appeals, Sixth Circuit.

Oct. 28, 2002.

Before DAVID A. NELSON, BOGGS, and NORRIS, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Top Driver, Inc., is a New Jersey-based company that operates a national chain of driver training schools. In 1999 Top Driver agreed to buy a Cleveland-area driver training business, Heights Driving School, Inc., from John Cox, Heights' sole owner. (The actual purchase was to be made through a wholly-owned Top Driver subsidiary, TD Heights Acquisition, Inc.) As part of the agreement, Top Driver promised to enter into an employment contract with Daniel Cox, John's son.

A few days before the scheduled closing of the transaction, one of Heights' instruc-tors was arrested and charged with raping a driving school student. After learning of this arrest, Top Driver refused to go through with the deal as planned.

Heights, John Cox, and Daniel Cox brought a breach of contract action against Top Driver and TD Heights Acquisition in a state court. Top Driver removed the case to federal court on diversity grounds and filed a counterclaim. A jury found in favor of the defendants on all counts after the district court denied a defense motion for a directed verdict. Claiming prejudi-cial errors in the admission of evidence and in the jury instructions, the plaintiffs have appealed the judgment entered on the jury's verdict. The defendants have cross-appealed the denial of their motion for judgment as a matter of law.

We shall affirm the district court's dis-position of the matter.

I

John Cox started a driver training busi-ness in Cleveland Heights, Ohio, shortly after his graduation from high school in 1954. Incorporated under the laws of Ohio in 1957, the business became known as the Heights Driving School. The company ex-panded over the years, and Heights oper-ated out of 11 locations in the Cleveland area by the time of the events that gave rise to the lawsuit.

In the fall of 1998 John Cox received a call from a man named Sebastian Giorda-no, the Chief Financial Officer of Top Driver, Inc. That company, a Delaware corporation with its principal offices in New Jersey, ran a nationwide driver train-ing business and was interested in buying the Heights Driving School. Giordano ar-ranged to meet with John and Dan Cox to discuss Top Driver's proposed terms.

Top Driver sent the Coxes a letter dated February 19, 1999, in which it formally

offered to purchase Height's assets. The Coxes' written response set a sale price of $1.4 million. In March of 1999 the parties signed a letter of intent that apparently involved an asset-purchase deal. Sometime after signing this letter, however, John Cox determined that a sale of assets would not be advantageous from a tax standpoint. The parties then worked out a second letter of intent, signed as of July 12, 1999, changing the deal to one in which Top Driver would acquire all of the stock in Heights. This was followed by a 48–page contract entitled "Stock Purchase Agreement," signed by Giordano and John Cox on September 30, 1999.

Late in October Dan Cox, whose employment contract with Top Driver was annexed to the purchase contract, attended a Top Driver conference in Indianapolis to learn more about his soon-to-be employer's training methods. Top Driver subsequently gave Dan Cox power of attorney under which he was to register 16 training cars the company had shipped to a Heights location. (The Coxes put some of Top Driver's 16 cars into service, later testifying that they had Top Driver's permission to do so.) On November 18, 1999, Top Driver's executive committee officially approved the Heights acquisition. Representatives of Top Driver met with Heights employees on the same day to announce the impending change of ownership. The relevant state licenses were issued in Top Driver's name the following Monday, November 22, in time for a closing set for November 23.

One Heights employee, a man named Charles Platia, failed to attend the November 18 employee meeting. After the session ended, John Cox called Platia's wife and learned that Mr. Platia had been arrested on November 17. On further inquiry, Cox learned that Platia was accused of raping a 15–year–old Heights student.

John Cox told his son about the charges against Platia on Friday morning, November 19. After consulting with Heights' attorney, Dan Cox returned a call from the Cleveland Plain Dealer and left a message to the effect that Heights was cooperating with the police investigation.

According to Brian Miller, Top Driver's director of acquisitions, Top Driver did not know of Platia's arrest until Monday, November 22, when it received a call from a concerned parent. The company then learned the details of the allegations against Platia from a *Cleveland Plain Dealer* article published on Saturday, November 20. Although that article contained a quote from Dan Cox, no one from Heights had informed Top Driver of Platia's arrest.

Miller testified that Platia's arrest was a "red light" for Top Driver. The company did not go through with the November 23 closing, and, concerned about potential corporate liability, Top Driver soon concluded that a stock purchase was no longer desirable.

The parties attempted to restructure the deal, Top Driver offering to purchase Heights' assets at a higher total price than that agreed to for the stock. By early December of 1999, however, Top Driver had begun to demand that Heights return the 16 cars shipped in October. On December 13, in a letter marked "NOT a notice terminating the Stock Purchase Agreement," Top Driver took the position that Platia's arrest violated a covenant made by Heights in the contract.

On the same day, December 13, Heights, John Cox and Dan Cox filed their lawsuit against Top Driver and its subsidiary, TD Heights Acquisition, in the Court of Common Pleas of Cuyahoga County, Ohio. Claiming that Top Driver had violated its contractual obligations to buy the driving school business and to employ Dan Cox,

the plaintiffs sought damages in excess of $1.7 million.

On December 30, 1999, after the case had been removed to federal court, Top Driver sent John Cox a letter purporting to terminate the stock purchase agreement. In an answer and counterclaim filed in federal court a few days later, the defendants asked for the return of the 16 cars shipped to Heights in October of 1999. Top Driver eventually got all of the cars back, but sought judgment for costs incurred in doing so.

The case went to trial on November 30, 2000. Following several days of testimony, and after the denial of a defense motion for a directed verdict, the jury awarded the defendants $4,625 in damages for conversion of the 16 cars and awarded the plaintiffs nothing on their breach of contract claims. A renewed motion for judgment as a matter of law was denied, and the appeal and cross-appeal followed.

## II

We turn first to the text of the stock purchase agreement. New York law, applicable in this case by reason of a choice-of-law clause in the contract,[1] tells us that "the construction of a plain and unambiguous contract is for the court to pass on...." *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 307 N.Y.S.2d 449, 255 N.E.2d 709, 711 (N.Y. 1969). Our review of the district court's interpretation is *de novo*, as long as the contract is "plain and unambiguous."

The plaintiffs rely on ¶ 2.5 of the purchase agreement, which reads, in pertinent part, as follows:

"The Closing (the *'Closing'*) of the transactions contemplated by this Agreement shall be done ... within ten (10) days following the obtaining by Purchaser of all necessary licenses and governmental approvals to operate the Business (the *'Closing Date'*)."

The plaintiffs submit that this provision required Top Driver to close the transaction on or before December 2, 1999, 10 days after Top Driver obtained the "necessary licenses" from the State of Ohio.

Paragraph 2.5 is quite clear about the time at which the closing should occur— *i.e.*, within 10 days of the issuance of "all necessary licenses and government approvals." The parties agree that Top Driver obtained these licenses on November 22, 1999. If there were nothing more in the contract, therefore, it would be obvious that the parties were obligated to close the purchase on or before December 2, 1999.

But there is more. Top Driver's obligation to close the stock purchase is subject to Article VII of the contract, entitled "Conditions to Obligations of Purchaser and Parent." Among the conditions set forth in Article VII are ¶ 7.1.1, which states that "[a]ll representations and warranties of the Company [Heights] and Seller [John Cox] contained in this Agreement ... shall be true and correct as of the Closing," and ¶ 7.1.2, which says that "[a]s of the Closing, the Company and Seller shall have performed and complied with all covenants and agreements...."[2] Fur-

---

1. Paragraph 11.10 of the contract provides, in pertinent part: "This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to such State's rules governing the conflicts of laws."

2. The "representations," "warranties," "covenants and agreements" made by the plaintiffs include ¶ 5.1, agreeing to "deliver ... prompt written notice of any event or condition ... [that] would result in any of the representations and warranties of the Company and/or Seller herein being untrue in any respect;"

thermore, ¶ 7.1.13 provides that the obligation to close shall be subject to Top Driver's having "satisfactorily completed, as determined in its sole discretion, its due diligence review of the Business, the Company, and the Seller." And last but not least, ¶ 7.1.9 subjects Top Driver's obligations to the condition that "there shall have been no event or development, or combinations of changes or developments which, individually or in the aggregate, could be reasonably expected to have a Material Adverse Effect." Under the "Definitions" article of the contract, "material adverse effect" means "a material adverse effect on the businesses, prospects, properties, assets, liabilities, condition (financial or otherwise), or results of operations of the business . . . ."

Article IX of the agreement, "Termination Prior to Closing," is also relevant here. Under ¶ 9.1.3, the contract may be terminated upon written notice of either party, "at any time prior to Closing," if "any condition contained in Section 7.1 . . . is not satisfied by November 30, 1999." Top Driver claims that it terminated the contract by giving the required notice in its letter of December 30, 1999. The plaintiffs counter that ¶ 9.1.3 required Top Driver to give written notice of termination before the closing deadline prescribed by ¶ 2.5, which was December 2.

■ As we read the agreement, ¶ 7.1.9 made all of Top Driver's obligations, including its obligation to consummate the transaction within the time specified by ¶ 2.5, conditional upon the absence of developments that could reasonably be expected to have a material adverse effect on the Heights business. If that condition stood unsatisfied on November 30, ¶ 9.1.3

permitted Top Driver to cancel the contract. To terminate the agreement, Top Driver was required to give the plaintiffs written notice "prior to Closing" not prior to the scheduled closing date. No closing ever took place. When Top Driver sent its written termination notice on December 30, 1999, therefore, it was taking action prior to closing and the termination notice was not tardy under the terms of the agreement.

Our conclusion on this point it strengthened by the language of ¶ 9.1.4, which permits termination if "any material covenant or agreement" has not been performed "prior to the Closing Date." If notice is given pursuant to ¶ 9.1.4, the party in breach has 10 days to take curative action. In contrast, ¶ 9.1.3 permits immediate termination upon written notice prior to the closing itself, so long as there is a ¶ 7.1 condition that has not been met by November 30, 1999. Under ¶ 9.1.3, the closing date appears to be irrelevant.

The court instructed the jury as follows::

The plaintiffs must prove to you by a preponderance of the evidence that the parties entered into the stock purchase agreement . . . that the defendants broke the contract by failing to close the deal in a timely manner and that this caused the plaintiffs to suffer damages.

\* \* \* \* \* \*

In this case, plaintiffs John Cox and Heights Driving School are seeking to recover damages for alleged breach of the stock purchase agreement. The defendants argue that the stock purchase agreement contained numerous conditions which were not fulfilled and therefore the defendants argue that they did

---

¶ 5.3.4, promising to keep Top Driver informed of "all material developments," including "any circumstance that results, or could reasonably result, in a Material Adverse

Effect on the Business;" and ¶ 3.4.1.1, stating that "[t]here has not been a Material Adverse Effect."

not have a duty to close the transaction under the stock purchase agreement.

The plaintiffs have the burden of proving by a preponderance of the evidence that they tendered performance of the contract and tendered fulfillment of all the conditions under the stock purchase agreement. If the plaintiffs failed to prove ... that they tendered fulfillment of all the conditions of the alleged contract, then you must consider whether defendants timely gave written notice that they terminated the contract for the failure of the conditions.

If you also find the defendants gave timely written notice of termination, then you must find against the plaintiffs John Cox and Heights Driving School on their breach of contract claims.

If ... either plaintiffs tendered performance of all the conditions or [ ] defendants failed to timely give written notice of the failure of conditions ... then you must find for John Cox and Heights Driving School and against the defendants on the breach of contract claims...."

The central issue, as the district court framed it for the jury, was whether the plaintiffs failed to perform certain conditions in the contract. If the plaintiffs failed to prove that they had performed the conditions, the defendants did not have a duty to close the deal. The district court's jury instructions were entirely consistent with the contract as we have interpreted it.[3] To the extent that the meaning of the contract may have been ambiguous, the district court properly left its interpre-

tation to the jury. See *Quinn v. Buffa*, 97 A.D.2d 752, 468 N.Y.S.2d 173, 174 (N.Y.App.Div.1983). The fact that the court did not qualify the phrase "all conditions" by reminding the jury that some conditions were pegged to the time of the closing was, in our view, a harmless omission. Those conditions were not at issue during the trial, and we have no reason to suppose that the jury would have been confused by the instruction as it was worded.

Top Driver's theory at trial was that it was relieved of its obligation to close the deal because Platia's rape arrest qualified under ¶ 7.1.9 as an "event or development ... which ... could be reasonably expected to have a Material Adverse Effect." One of the adverse effects Top Driver highlighted was liability based on Platia's criminal behavior. In response, the plaintiffs attempted to introduce expert testimony that Heights would not be civilly liable to Platia's victim under Ohio law. The proffered evidence, the plaintiffs argued, showed that Top Driver's expectation of a material adverse effect was unreasonable. The trial judge refused to admit the evidence, a ruling that the plaintiffs contend was an abuse of discretion.

Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed.R.Evid. 403. A district court's decision to exclude evidence for one of these reasons is reviewed only for abuse

---

3. The plaintiffs argue in their brief that the defendants bore the burden of proof on the issue of performance of conditions, as if this were an affirmative defense. But in New York, at least, it appears that "[t]he party seeking to enforce a contractual obligation generally bears the burden of proof with respect to a condition precedent." See *Ra-*

*chmani Corp. v. 9 East 96th Street Apartment Corp.*, 211 A.D.2d 262, 629 N.Y.S.2d 382, 386 (N.Y.App.Div.1995). See also *First Tennessee Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 327–28 n. 6 (6th Cir.2001) (contrasting the pleading burden created by Rule 9(c) with the burden of persuasion on the issue of a condition precedent).

of discretion. *Sutkiewicz v. Monroe County Sheriff,* 110 F.3d 352, 357 (6th Cir.1997).

The plaintiffs argue that under *Byrd v. Faber,* 57 Ohio St.3d 56, 565 N.E.2d 584 (1991), they cannot be held liable for Platia's rape of a Heights student on a *respondeat superior* theory.[4] The *Byrd* court held that

"in order for an employer to be liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment. Moreover, when the tort is intentional, ... the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed* * *.'" 565 N.E.2d at 587 (asterisks in original).

*Byrd,* which involved the liability of a church for a rape committed by one of its pastors, certainly favors the plaintiffs' view of Ohio law. That case has subsequently been distinguished, however, as "involv[ing] the strictly religious aspects of the church and its relationship to parishioners (not employees) and its pastor." *Davis v. Black,* 70 Ohio App.3d 359, 591 N.E.2d 11, 15 (Franklin 1991). Furthermore, a panel of this court has noted, in an unpublished opinion, that *"Byrd*'s validity may have been affected by *Kerans v. Porter Paint Co.,* 61 Ohio St.3d 486, 575 N.E.2d 428, 493 (Ohio 1991)...." *Mullholland v. Harris Corp.,* 72 F.3d 130, 1995 WL 730466 (6th Cir.1995), *cert. denied,* 517 U.S. 1172, 116 S.Ct. 1578, 134 L.Ed.2d 676 (1996).

■ These cases suggest that if the court had allowed the plaintiffs' Ohio law experts to take the stand in the case at bar, the defendants might well have offered experts testifying to a different interpretation of Ohio's *respondeat superior*

doctrine. Such a debate could easily have led the jury to suppose that whether the defendants could reasonably expect a material adverse effect—the actual issue under ¶ 7.1.9 of the contract—depended on whether Heights would prevail in a civil action filed against it in Ohio state court. The trial judge permitted Heights' attorney to express his view that a civil lawsuit would be frivolous, but refused to allow detailed, potentially confusing testimony about the merits of such a suit. We do not believe that this was an abuse of discretion.

For similar reasons, the trial judge refused to allow a plaintiffs' expert to testify that it was illegal or improper for the plaintiffs' insurance company to deny coverage for any civil claim against Heights. Although the plaintiffs now advise that they have been granted coverage, the insurance company had sent them a denial letter as of the trial date. Allowing testimony on the merits of this denial also might have confused the issue. Again, the trial court did not abuse its discretion in excluding such marginally relevant but quite complex and confusing evidence.

The plaintiffs also contend that the district court erred in not instructing the jury on Ohio's law of *respondeat superior,* as set forth in *Byrd.* According to the plaintiffs, such an instruction was necessary to determine the reasonableness of Top Driver's belief that Platia's rape arrest would lead to materially adverse consequences for Heights' business. The plaintiffs further take issue with the court's omission of a proposed successor liability instruction, which instruction they say was necessary to show that Top Driver would have been no better off purchasing Heights' assets

---

4. Since the question of civil liability is not one regarding the interpretation of the contract, the parties agree that Ohio law controls.

than it would have been with a purchase of stock.

A court's refusal to give a jury instruction is reversible error if "(1) the omitted instructions are a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; (3) the failure to give the instruction impairs the requesting party's theory of the case." *Hisrich v. Volvo Cars of North America, Inc.*, 226 F.3d 445, 449 (6th Cir.2000). Again, the instructions must be viewed as a whole; we will only reverse if they are confusing, misleading or prejudicial. *Id.*

We do not think that the omission of the instructions in question impaired the plaintiffs' ability to present their case. Whether or not Heights could be found civilly liable in a suit arising out of its employee's conduct was simply not the question in this case. Neither was Top Driver's liability as a successor to Heights under an asset deal versus a stock purchase deal. For the same reasons that the district court was free to avoid jury confusion by excluding evidence on these points, the court was free not to instruct the jury on them.

■ Finally, the plaintiffs argue that only events occurring before December 31, 1999 the date they received Top Driver's written notice terminating the contract—could be relevant to the reasonableness of the termination. On this ground the plaintiffs contend that the district court abused its discretion in admitting evidence of a civil lawsuit filed against Heights in October of 2000 by one of Platia's alleged victims. But the filing of this action was clearly relevant insofar as it tends to support the legitimacy of Top Driver's fear of litigation. See Fed.R.Evid. 401. While the evidence is not highly probative, we cannot say that the district court abused its discretion in admitting it.

III

The plaintiffs also make several arguments unrelated to the interpretation of the agreement. The first concerns an issue arising from one of the plaintiffs' pretrial motions *in limine*. Through that motion the plaintiffs sought to prevent Top Driver from denying it had performed all of the conditions precedent set forth in the contract. The plaintiffs point to Federal Rule of Procedure 9(c), which provides that a pleading denying the performance or occurrence of a condition precedent "shall be made specifically and with particularity." Top Driver's answer, say the plaintiffs, violated Rule 9(c) by failing to state precisely which conditions precedent the plaintiffs had failed to meet. Accordingly, the plaintiffs contend, the district court abused its discretion by denying the motion.

It is true that although the complaint properly alleged that the plaintiffs had "performed and completed their portions of the agreement," Top Driver's answer and amended answer failed to identify specific conditions precedent that the plaintiffs had not performed. Those pleadings stated only that "the conditions set forth in Article VII of the Agreement have not been satisfied...." In its motion for summary judgment, however, Top Driver identified approximately 20 separate provisions that it alleged were unsatisfied. Among them were the paragraphs requiring that there be no material adverse effect on the Heights business. The summary judgment motion was filed more than seven months before the plaintiffs' motion *in limine*.

■ Rule 9(c) does not specify that a denial of the performance of a condition precedent must be made in an answer or amended answer. Under the circumstances of this case, we think that the specific denials made in Top Driver's sum-

mary judgment motion are sufficient. *Cf. Stearns v. Consolidated Management, Inc.,* 747 F.2d 1105, 1112 (7th Cir.1984) ("A defendant may raise the issue of non-performance of a condition precedent prior to trial by way of a motion for summary judgment"); 2 Moore's Federal Practice § 9.04[3] (3d ed. 2000) ("Denial of performance or occurrence of a condition precedent can also be made in a motion for summary judgment"). We also consider it relevant that Top Driver, in a letter dated December 13, 1999, had already claimed "a material adverse effect on the business" as a result of Platia's arrest. There does not appear to have been any real confusion at trial about the contract clauses at issue, moreover, counsel's protestations to the contrary notwithstanding.

The plaintiffs further contend that the district court erred in admitting evidence that Platia and Heights were brought before an Ohio administrative body in 1998. That hearing was the result of Platia's telling a driver's education class, apparently in jest, that boys were smarter than girls. The district court let Top Driver's attorney cross-examine John Cox about this event, even though Platia was found not to have engaged in sexual harassment. (Heights was placed on a one-year probation for an unrelated problem.) The plaintiffs contend that this evidence was prejudicial to them and that the 1998 administrative hearing had nothing at all to do with Platia's subsequent arrest for rape.

■ John Cox testified on direct examination that Platia was an "excellent" employee who "was extremely popular with both boys and girls." Top Driver sought to challenge these assertions and to cast doubt on John Cox's credibility by asking him about the 1998 incident. Indeed, in its initial cross-examination, Top Driver asked only if there had been a "complaint" against Platia and if it had resulted in a hearing. The specifics of the incident were brought out on re-direct examination. Given John Cox's assertions about Platia's employment history, we find that cross-examining him on a complaint filed against Platia was well within the scope of direct examination. See Fed.R.Evid. 611(b). Moreover, we do not believe that the plaintiffs were unfairly prejudiced by the revelation that Platia had been accused of sexual harassment and acquitted.

The plaintiffs' next contention is that the district court abused its discretion when it refused to let the plaintiffs cross-examine a witness using the deposition testimony of Robert Feingold, general counsel to Top Driver and an officer in the company. The plaintiffs point out that Rule 32(a)(2) of the Federal Rules of Civil Procedure permits an adverse party to use the deposition of a corporate officer "for any purpose." Even under Rule 32, however, "the admission of deposition testimony still remains subject to the sound discretion of the trial court, and it has a perfect right to limit the use of the material if the deposition is repetitious or immaterial." *Coletti v. Cudd Pressure Control,* 165 F.3d 767, 773 (10th Cir.1999) (citations, brackets and internal quotation marks omitted).

Although the district court did not fully articulate its reasons for excluding the deposition during the trial, we see no abuse of discretion. Mr. Feingold's deposition appears to be cumulative of other evidence offered by the plaintiffs to show that, as Feingold conceded, Top Driver was "looking for excuses to get out of going through with the transaction." Feingold's deposition, as we read it, adds little or nothing to the plaintiffs' case.

In their final assignment of error, the plaintiffs argue that the district court misinterpreted New York law when it instructed the jury that the plaintiffs were

required to mitigate damages if Top Driver broke the contract. However, as the district court indicated in its opinion denying the plaintiffs' motion for a new trial, the question was moot because the jury found that the plaintiffs, not the defendants, had broken the contract. We agree with the district court that the plaintiffs could not have been prejudiced by this instruction, regardless of whether it was a proper statement of New York law.

AFFIRMED.